Argued and submitted January 22, reversed and remanded for entry of judgment
in favor of City of Eugene October 31, 2001

# AT&T COMMUNICATIONS
## OF THE PACIFIC NORTHWEST, INC.,
a Washington corporation,
and AT&T Wireless Services of Oregon, Inc.,
a Nevada corporation,
*Respondents,*

*v.*

## CITY OF EUGENE,
an Oregon municipal corporation,
*Appellant.*

16-98-12672; A105861

35 P3d 1029

William F. Gary argued the cause for appellant. With him on the briefs were Linda J. Kessel and Harrang Long Gary Rudnick P.C.

Stephen F. Crew and Howard J. Symons argued the cause for respondents. With them on the brief were T. Chad Plaster, Ramis Crew Corrigan & Bachrach, LLP, and Mintz Levin Cohn Ferris Glovsky and Popeo, PC, Washington, D.C.

Zachary W.L. Wright, Kristin Hazard Hamilton, and Tonkon Torp LLP, filed a brief *amicus curiae* for Oregon Telecommunications Association.

Sandra L. Arp filed a brief *amicus curiae* for League of Oregon Cities.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

At issue in this case is the validity of a City of Eugene (city) ordinance that imposes various fees and regulatory requirements on telecommunications providers that offer telecommunications services in the city. AT&T Communications of the Pacific Northwest, Inc. (AT&T Communications), and AT&T Wireless Services of Oregon, Inc. (AT&T Wireless), complain that the ordinance is preempted by state and federal law. The trial court agreed and entered summary judgment declaring the ordinance invalid and enjoining the city from enforcing it. The city appeals, arguing that the trial court erred in concluding that the ordinance is preempted by either state or federal law. We agree and reverse and remand.

## I. FACTUAL BACKGROUND

The relevant facts are not in contention. The city is a home rule municipality, governed by a charter enacted by the people in 1976. Among other things, that charter grants the city the following authority:

"(2) The city has all powers that the constitution or laws of the United States or of this state expressly or impliedly grant or allow cities, as fully as if this charter specifically stated each of those powers.

"(3) In this charter no mention of a particular power may be construed to be exclusive or to restrict the scope of the powers that the city would have if the particular power were not mentioned. The charter shall be liberally construed, to the end that the city have all powers necessary or convenient for the conduct of its affairs, including all powers that cities may assume under state laws or the provisions of the state constitution regarding municipal home rule."

Eugene Charter ch II, § 4 (1976).

Before 1997, the city regulated the use of its rights-of-way to provide telecommunications services by means of franchise agreements. Those agreements, some of which are still in force, typically grant each telecommunications service provider a nonexclusive privilege to use city rights-of-way to provide service. In exchange for the privilege to use the

rights-of-way, the telecommunications service providers are required to pay a fee, calculated by the linear foot of communications facilities located within the city.

AT&T Communications is authorized to provide local and long distance telecommunications services throughout the state. It has been designated a "competitive telecommunications services provider" by the Public Utility Commission (PUC).[1] In 1988, AT&T Communications entered into a franchise agreement with the city to use local rights-of-way to provide long distance telecommunications services. The agreement runs for a 15-year term and, unless terminated earlier, will expire on April 11, 2003. AT&T Wireless provides cellular telephone service throughout the state as a "radio common carrier."[2] It has one tower located on public property in the city.

In 1997, the city adopted Ordinance 20083, which was codified at Eugene Code (EC) section 3.400 *et seq.*, intending to create a "coordinated regional information infrastructure that provides accessible and affordable high-speed connectivity for citizens, public institutions, and businesses" by ensuring that rights-of-way are used efficiently and that the city is fairly compensated for the use of those rights-of-way. Two parts of the ordinance are pertinent to this case: its registration and its right-of-way licensing provisions.

The registration requirement applies broadly to any person who "engage[s] in any telecommunications activity through a communications facility located in the city." EC § 3.405(1). Such a person must register with the city and pay

---

[1] Under ORS 759.020(1), no person may provide telecommunications services on a "for-hire" basis without a certificate of authority from the PUC. The PUC may classify a provider as either a "telecommunications utility" or as a "competitive telecommunications services provider." ORS 759.020(5). Classification as a "competitive telecommunications services provider" is permitted if the PUC finds that, among other things, the services that the provider will offer are subject to competition by other providers at comparable rates, terms, and conditions. ORS 759.020(5).

[2] A "radio common carrier" includes any provider of "cellular communications service for hire." ORS 759.005(2)(e). Providers of cellular service are not subject to the certificate of authority requirement of ORS 759.020(1), because that requirement only applies to providers of "telecommunications service," and that term is defined by statute to *exclude* "services provided by radio common carrier." ORS 759.005(2)(g)(A).

an annual registration fee equal to two percent of its "gross revenues derived from its telecommunication activities within the city." EC § 3.415(1). Revenues from the registration fee are used to "implement programs which will advance universal service, quality of telecommunications services, and protect the rights of consumers."

The right-of-way licensing provision applies to any person not operating under an existing franchise agreement who proposes to "construct, place or locate any facility in, upon, beneath, over or across any public right-of-way or on other public property" in order to provide telecommunications services. EC § 3.410(1). Such a person must submit a right-of-way license application that provides certain information to the city, including the identity of the applicant, a description of the services to be provided, the location of the proposed facility that will be located in or on the right-of-way, a description of the manner in which the system will be installed, the time required for construction, identification of the area to be served, and proof that the applicant is both financially capable and technically qualified to complete the project. Telecommunications Administrative Rule § 3.400C(2). The applicant also must pay a right-of-way licensing fee equal to seven percent of the provider's gross revenues derived from the provision of telecommunications services within the city. EC § 3.415(2). The license fee is intended to compensate the city for, among other things, the use of the rights-of-way, accelerated deterioration of streets, and the public inconvenience associated with telecommunications provider construction crews and equipment.

The revenues generated from the registration and license fees is kept in a separate subfund of the city's general fund. They are earmarked for covering the costs of the registration and licensing programs and paying for a number of new telecommunications-related construction projects, including updating and maintaining the public library's computer systems, purchasing a new live-scan fingerprinting system, and providing citizens with greater Internet access to city hall services.

AT&T Communications and AT&T Wireless initiated this action to obtain a declaration that the registration

and licensing provisions of the ordinance are invalid. They alleged that the ordinance is preempted by various state and federal statutes and the state constitution, specifically:

(1) ORS 221.515, which authorizes local governments to impose a right-of-way tax on telecommunications carriers not to exceed seven percent of gross revenues earned within their boundaries;

(2) ORS 307.215, which prohibits the imposition of a tax "on amounts paid for exchange access or other telephone services";

(3) ORS chapter 759, which authorizes the PUC to regulate telecommunications services generally and, according to AT&T Communications and AT&T Wireless, leaves little authority to local governments;

(4) *Former* Article XI, section 11(g)(8)(a), of the Oregon Constitution, which, although repealed in 1997, AT&T Communications and AT&T Wireless contend invalidates the ordinance by virtue of its prohibition of new product or service taxation to fund services that previously were funded by *ad valorem* property taxation;

(5) Article IX, section 3, of the Oregon Constitution, which requires that "every law imposing a tax [must] state distinctly the purpose to which the revenue shall be applied;" and

(6) 47 USC § 253 (Supp 2001), which bars state or local regulation that prohibits or has the effect of prohibiting the ability of any entity to provide telecommunications service.

In addition, AT&T Wireless contends that the city's telecommunications ordinance violates 47 USC § 332 (Supp 2001), which prohibits state and local governments from regulating entry of and rates charged for commercial mobile radio services, such as cellular telecommunications.

AT&T Communications and AT&T Wireless moved for summary judgment. The city also moved for summary judgment. The trial court granted the motion of AT&T Communications and AT&T Wireless, denied the city's motion,

and entered judgment accordingly. The court did not spell out the basis for its decision; that is to say, it did not explain which of the state or federal laws preempted the registration and licensing provisions of the ordinance.

## II. PRELIMINARY ISSUE: JUSTICIABILITY

The city argues that, before we address the merits of the parties' contentions, we must address the extent to which there is a justiciable controversy. In particular, the city argues that AT&T Communications's and AT&T Wireless's challenges to the right-of-way licensing fee—as opposed to the registration fee—is not ripe, because neither party currently is required to pay the fee. According to the city, AT&T Communications currently is exempted from the right-of-way licensing fee requirement because it operates under a franchise agreement. As for AT&T Wireless, the city contends that it is not subject to the fee because it has interpreted the fee not to apply.

AT&T Communications concedes that it currently is exempt from paying the license fee. It argues that its challenge to the fee nevertheless is ripe because the franchise agreement is set to expire in little more than a year, and, at that point, it certainly will become subject to the fee requirement. AT&T Wireless also concedes that it currently does not use a city right-of-way but argues it still is subject to the licensing fee because it has a single tower located on public property for which the city simply has chosen not to charge. According to AT&T Wireless, the fact that the city chooses not to apply the ordinance does not mean that the challenge to the ordinance is not ripe. Furthermore, argues AT&T Wireless, the existence of the license fee requirement affects the way in which it periodically reconfigures its wireless system, by adding or moving cell sites in the area.

To obtain declaratory relief, a complaint must state a justiciable controversy. *Brown v. Oregon State Bar,* 293 Or 446, 449, 648 P2d 1289 (1982). A justiciable controversy is one that, among other things, is based on present facts, not on hypothetical possibilities. *Id.* It is not one in which the rights of the parties are contingent on the happening of an event that cannot be forecast and may never take place. *Hale*

*v. Fireman's Fund Ins. Co. et al,* 209 Or 99, 103-04, 302 P2d 1010 (1956). Nevertheless, a party need not wait until a challenged law actually applies so long as the eventual application to the party is not a matter of speculation. *Savage v. Munn,* 317 Or 283, 292, 859 P2d 298 (1993). Similarly, the voluntary cessation of a challenged action does not necessarily render a challenge nonjusticiable. *Tanner v. OHSU,* 157 Or App 502, 510, 971 P2d 435 (1998), *rev den* 329 Or 528 (1999).

■ In this case, the application of the right-of-way license fee requirement to AT&T Communications is not a matter of speculation. There is no dispute that, in fact, it will apply upon the expiration of the existing franchise agreement. The company's challenge to the license fee therefore is ripe. As for AT&T Wireless, the company has located a facility on public property, which subjects it to the license fee requirement. The city apparently has chosen not to enforce the fee requirement, but that does not render the company's challenge nonjusticiable. *Id.* In any event, the existence of the fee requirement affects the way in which the company plans periodic reconfiguration of its system. We therefore conclude that its challenge is ripe.

### III. ANALYSIS OF CLAIMS ON THE MERITS

On appeal, the city argues that the trial court erred in concluding that the ordinance is preempted by state or federal law. Conversely, AT&T Communications and AT&T Wireless contend that the trial court correctly concluded that the ordinance is preempted because it violates at least one of the state or federal laws on which they rely. Because there are no genuine issues of material fact, we review the court's decision to determine whether any party was entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.,* 325 Or 404, 420, 939 P2d 608 (1997). In evaluating the trial court's decision, we begin with the state law claims before turning to those based on federal law. *State v. Kennedy,* 295 Or 260, 262, 666 P2d 1316 (1983).

A. *State Law Claims*

1. *Violation of ORS 221.515*

AT&T Communications and AT&T Wireless contend that, under ORS 221.515, municipalities are authorized

to tax only "telecommunications carrier[s]" for use of municipal rights-of-way. Because neither are "telecommunications carrier[s]" within the meaning of that statute, they reason, the city is not authorized to tax them, and the ordinance requiring the payment of taxes—in the form of registration and licensing fees—is unlawful.[3] The city argues that ORS 221.515 affirmatively authorizes municipalities to tax "telecommunications carrier[s]," but neither that statute nor any other provides that municipalities may tax *only* telecommunications carriers. AT&T Communications and AT&T Wireless reply that, although the statute does not expressly provide that municipalities may tax only telecommunications carriers, by enacting a statute authorizing the taxation of telecommunications carriers, the legislature implicitly eliminated the power to levy other taxes. We agree with the city.

ORS 221.515(1) provides:

> "The council of every municipality in this state may levy and collect from every telecommunications carrier operating within the municipality and actually using the streets, alleys or highways, or all of them, in such municipality for other than travel, a privilege tax for the use of those streets, alleys or highways, or all of them, in such municipality in an amount which may not exceed seven percent of the gross revenues of the telecommunications carrier currently earned within the boundaries of the municipality."

The term "telecommunications carrier" is defined by cross-reference to ORS 133.721(8), which defines the term as either a "telecommunications utility as defined in ORS 759.005" or a "cooperative corporation * * * that provides telecommunications services." The statutory definition of "telecommunications utility," in turn, contains a number of express exclusions, two of which are pertinent to this appeal.

---

[3] The city's ordinance uses the term "fee" in connection with the charges imposed for registration and licensing. The city nevertheless contends that the fee amounts, in substance, to a tax. Indeed, there appears to be some looseness in the labeling that applies. ORS 221.515(1), for example, refers to right-of-way license fees as "privilege tax[es]" for the use of rights-of-way. AT&T Communications and AT&T Wireless do not contend that the fees at issue are not, in fact, taxes. Their only contention is that the taxation that the city has imposed has been preempted by state and federal law.

First, the term "telecommunications utility" does not include "[a]ny person acting only as a competitive telecommunications provider." ORS 759.005(1)(b)(C). A "[c]ompetitive telecommunications provider" is defined as a "telecommunications services provider which has been classified as such by the Public Utility Commission." ORS 759.005(2)(a).

Second, the term "telecommunications utility" does not include a "radio common carrier" that provides cellular communications services for hire, because such services are not considered "telecommunications services" within the meaning of the statute. ORS 759.005(2)(g)(A).

From the foregoing definitional detour, it is clear that neither AT&T Communications nor AT&T Wireless is a "telecommunications carrier" within the meaning of ORS 221.515. AT&T Communications is not, because it has been certified by the PUC as a competitive telecommunications services provider. AT&T Wireless is not, because, as a radio common carrier that provides cellular communications services, it does not provide telecommunications services.

ORS 221.515 authorizes the imposition of a tax on "telecommunications carrier[s]." Thus, that statute does not affirmatively authorize the city to impose the registration and licensing fees on AT&T Communications and AT&T Wireless. The question remains, however, whether that statute is the sole source of authority to impose such fees.

■■ Article XI, section 2, of the Oregon Constitution, provides that "[t]he legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon." Similarly, Article IV, section 1(5), further provides, in part, that:

"The initiative and referendum powers reserved to the people * * * are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district."

Those "home rule" provisions permit the people of cities or towns to determine for themselves the organization and powers of their local governments without the need to obtain authority from the state legislature. *Jarvill v. City of Eugene*, 289 Or 157, 168-69, 613 P2d 1, *cert den* 449 US 1013 (1980). The organization and powers of such local governments may be limited "preempted"—by state or federal statute or constitution. *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *adhered to on reh'g* 284 Or 173, 586 P2d 765 (1978). A local law will be considered preempted if it is "incompatible" with legislative policy, that is to say, if local and state or federal law cannot operate concurrently or if the state legislature or Congress intended to preempt the local enactment. *Id.* at 148. Whether a city has the authority to impose a tax therefore depends on two issues: First, whether the charter of the city confers the authority to impose the tax; and, second, whether that authority has been preempted by state or federal law. *Id.* at 142.

■ In this case, as we have noted, the city's charter broadly confers all authority not specifically denied by state or federal statute or constitution. Such broad charters have been construed to confer on municipalities the power to impose taxes. For example, in *Multnomah Kennel Club v. Dept. of Rev.*, 295 Or 279, 666 P2d 1327 (1983), the Supreme Court addressed the validity of a county business income tax on pari-mutuel racing establishments. The county charter contained a general grant of authority "over matters of county concern to the fullest extent granted or allowed," *id.* at 284 n 4, but it failed to mention specifically the power to tax. Moreover, the legislature had not enacted a statute expressly authorizing the county to tax. The court nevertheless concluded that the general grant of power sufficed, and that it was "an implicit power" of the county to levy taxes. *Id.* at 284; *see also* Herman Kehrli and James M. Mattis, *The Authority of Home Rule Cities and Counties in Oregon to Levy Sales and Income Taxes—An Affirmative View*, 5 Will L Rev 183, 191 (1969) ("There is no reason to suggest that * * * a general grant in a home rule charter does not confer the 'whole sum' of municipal powers."). We therefore conclude that, in this case, the 1976 city charter confers on the city the power to impose the registration and license fees.

There remains the question whether the exercise of that authority has been preempted by ORS 221.515. By its terms, that statute affirmatively authorizes municipalities to impose a privilege tax upon telecommunications carriers for the use of rights-of-way. It then imposes certain limitations on the amount; specifically, the tax may not exceed seven percent of gross revenues. Absent from the statute is any language remotely suggesting that a municipality cannot levy any other tax.

AT&T Communications and AT&T Wireless insist that, by conferring on municipalities the power to impose a privilege tax on telecommunications carriers, the legislature prohibited municipalities from imposing any tax other than a privilege tax on telecommunications carriers. In support of that contention, they cite *Eugene Theatre et al. v. Eugene et al.*, 194 Or 603, 243 P2d 1060 (1952).

In *Eugene Theatre*, a local movie theater challenged the validity of a City of Eugene license fee on theatrical exhibitions and other public amusements. The plaintiff argued that the fee was beyond the authority granted to the city in its charter. At that time, the city did not operate under a home rule charter. Instead, it operated under a 1905 charter of authority granted directly by a special act of the legislature that contained limited taxing authority. Thus, the question in that case was whether the power to impose the license fee was within the scope of the powers that were granted the city in the special act. The court held that it was not. According to the court, by specifically enumerating in the charter the types of taxation that it intended to confer on the city, "the state has given all it intended should be exercised." *Id.* at 617. Because the particular license fee at issue could not be found among the taxes that the legislature had chosen to authorize the city to collect, the court held, the city lacked authority to impose it. *Id.* at 633.

*Eugene Theatre*, in other words, was essentially a statutory construction case concerning the scope of taxation authority that the legislature conferred on a nonhome rule municipality. It did not hold that the city's authority to impose the license fee had been preempted. It held that the

city had been granted no authority to impose the license fee in the first place.

■ In contrast, in this case, the city secured broad authority to tax by virtue of its home rule charter. ORS 221.515 confirms that the city has the authority to impose a tax on telecommunications carriers for the use of its rights-of-ways, and the statute places limits on the amount of such a tax on telecommunications carriers. But the statute evinces no intention to go beyond that and to preempt any other form of municipal taxation. Indeed, to adopt the position of AT&T Communications and AT&T Wireless necessarily would mean that, by enacting ORS 221.515, the legislature intended to divest the city of the power to impose *any* other tax—whether a business license tax, or a hotel room tax, or any other tax not constituting a privilege tax on telecommunications carriers—not expressly authorized by the legislature. We find no such intention in the language of the statute. We conclude therefore that the challenged registration and license fees do not violate ORS 221.515.

## 2. *Violation of ORS 307.215*

AT&T Communications and AT&T Wireless next contend that the city's telecommunications registration and licensing fees violate ORS 307.215, which they read to prohibit any taxation of "amounts paid" for telephone service. According to the companies, a tax levied on their gross revenues is, at least indirectly, a tax on the amounts that have been paid to them for telephone service. The city contends that the statute does not apply, because its fees do not constitute taxes on amounts paid for telephone service. According to the city, the statute prohibits only taxes on telephone service *subscribers* and does not prohibit taxes on telephone service *providers*.

■ ORS 307.215 provides:

> "On or after January 1, 1982, no county, city, district or other political subdivision in this state shall levy or impose a tax on amounts paid for exchange access or other telephone services."

Whether the statute prohibits a tax on the gross revenues of telephone service providers is a question of statutory construction. In answering that question, we attempt to ascertain the intentions of the legislature, looking first to the text in context and then, if necessary, to its enactment history and other aids to construction. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

█ The text of the statute prohibits a tax "on amounts paid" for exchange access or other telephone services. It does not specify amounts paid by *whom*, but it certainly is implicit in the phrasing that it refers to amounts paid by subscribers for their exchange access and other telephone services. It does not appear to apply to taxation of telecommunications services provider revenues.

█ That reading of the text is borne out by an examination of its context. If the text of a statute was part of a larger bill that was codified at several places in the Oregon Revised Statutes, it is appropriate to examine that text in the larger context of the bill as a whole. *Miller v. Water Wonderland Improvement District*, 326 Or 306, 309 n 4, 951 P2d 720 (1998). In this case, what is now codified at ORS 307.215 was enacted as part of Oregon Laws 1981, chapter 533. That statute establishes an emergency telephone (9-1-1) system in the state, as well as a method of financing the system. It provides, in part, that the Emergency Services Division of the Executive Department (division) must adopt rules relating to the planning and administration of emergency telephone systems and prescribes certain minimum features. Or Laws 1981, ch 533, §§ 2, 3 (codified at ORS 401.720; ORS 401.730). To pay for the emergency telephone system, the statute requires telephone service customers "subscribers"—to pay a tax on their local telephone service equal to three percent of their charges for that service. Or Laws 1981, ch 533, § 10 (codified as note following ORS 401.790). The telephone services provider is responsible for collecting the tax and turning over the revenues to the Department of Revenue. Or Laws 1981, ch 533, § 13 (codified as note following ORS 401.790). The providers are deemed to hold the amounts collected in trust for the state. *Id.* The providers may seek reimbursement from the state for administrative costs entailed in collecting the tax. Or Laws 1981, ch 533, § 18(3) (codified as note

following ORS 401.790). The statute then provides that local governments may not "levy or impose a tax on amounts paid" for telephone service. Or Laws 1981, ch 533, § 21 (codified at ORS 307.215).

An examination of the text of ORS 307.215 in that context suggests strongly that the legislature did not intend to prohibit local governments from imposing a tax on telephone service provider revenues for other purposes. The focus of the statute is on financing the state emergency telephone system by means of a tax on *subscribers*. After imposing the three-percent tax on subscribers, the statute appears to declare that local governments cannot impose any other tax on amounts paid by subscribers for exchange access or other telephone service. There is no mention of taxation of telephone service providers themselves.

Any doubts as to the meaning of the statute are resolved by reference to the legislative history. Representative Ed Lindquist, the sponsor of the bill that was codified, in part, at ORS 307.215, explained quite clearly that his bill was not intended to prohibit local governments from exacting fees from telephone service providers for rights-of-ways and the like. For example, in introducing the bill to the subcommittee that first held hearings on it, he explained:

> "Once the statewide 9-1-1 tax is in effect, no county, city or other political subdivision [may] impose a tax on telephone services. *This section is not intended to apply to existing franchise fees, business taxes, etc.*, but would apply to any area currently imposing an excise tax of its own for 9-1-1."

Testimony, House Committee on Human Resources, subcommittee, HB 3178, May 21, 1981, Ex E (statement of Rep. Ed Lindquist) (emphasis added). The representative offered the same explanation to the House Revenue Committee, testimony, House Revenue Committee, HB 3178, June 4, 1981, Ex 5 (statement of Rep. Ed Lindquist), and in the Senate after the bill was passed by the House, testimony, Senate Revenue and School Finance Committee, HB 3178, July 9, 1981, Ex 16 (statement of Rep. Ed Lindquist).

Taken together, the text, context, and legislative history confirm that ORS 307.215 was not intended to preempt

local governments from imposing on telecommunications service providers the sort of registration and licensing fees that the city requires in its telecommunications ordinance.

### 3. *Preemption by ORS Chapter 759*

AT&T Communications and AT&T Wireless next contend that the entire telecommunications ordinance is preempted by the state's exercise of comprehensive regulatory authority over the provision of telecommunications services, as provided in ORS chapter 759.[4] Both companies place particular reliance on ORS 759.030, which confers on the PUC authority over the regulation of telecommunications services in the state. The city counters that nothing in ORS chapter 759 suggests that the PUC has *exclusive* regulatory authority over the provision of telecommunications services in the state. To the contrary, the city argues, the statutes expressly contemplate the exercise of concurrent local and state regulatory authority.

As we have noted, local government authority may be preempted in either of two ways: It may be preempted expressly, or it may be preempted implicitly, by virtue of the fact that it cannot operate concurrently with state or federal law. *LaGrande/Astoria*, 281 Or at 148. In this case, AT&T Communications and AT&T Wireless contend that the legislature expressly has preempted municipal regulation of the provision of telecommunications services in this state.

At the outset, we note that, when the legislature wishes to preempt local government regulation in a particular field, it knows how clearly to do so. ORS 731.840(4), for example, declares:

> "The State of Oregon hereby preempts the field of regulating or of imposing excise, privilege, franchise, income, license, permit, registration, and similar taxes, licenses and fees upon insurers and their agents and other representatives as such * * *."

---

[4] There is some debate whether AT&T Communications preserved this argument. But, because there is no debate that AT&T Wireless did preserve it, we pause no further to address the arguments concerning preservation.

*See also* ORS 203.090 ("The provisions of ORS 181.620, 181.870 to 181.889, 181.991 and 203.090 preempt any laws of the political subdivisions of this state relating to the regulation of private security officers, employers and security services."); ORS 288.610(2) ("ORS 288.605 to 288.695 preempts all statutory or charter authority to issue advance refunding bonds or to effect a forward current refunding."); ORS 462.100(1) ("The State of Oregon hereby preempts the imposition of taxes on or measured by income on, and the regulation of, race meets.").

■ It is not necessary to use the word "preempt" to manifest an intention to preclude local regulation. ORS 461.030(1), for example, makes the legislature's preemptive intentions regarding the state lottery quite clear:

> "This chapter shall be applicable and uniform throughout the state and all political subdivisions and municipalities therein, and no local authority shall enact any ordinances, rules or regulations in conflict with the provisions hereof."

*See also* ORS 455.040(1) ("The state building code shall be applicable and uniform throughout this state and in all municipalities, and no municipality shall enact or enforce any ordinance, rule or regulation relating to the same matters encompassed by the state building code * * * unless authorized by the Director of the Department of Consumer and Business Services."); ORS 467.136 ("Any local government or special district ordinance or regulation now in effect or subsequently adopted that makes a shooting range a nuisance or trespass or provides for its abatement * * * is invalid * * *."); ORS 634.057 ("No city, town, county or other political subdivision of this state shall adopt or enforce any ordinance, rule or regulation regarding pesticide sale or use * * *.").

■ But it is generally required that the legislature's preemptive intentions be clearly stated. *LaGrande/Astoria*, 281 Or at 148-49 (it is "reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by a statewide law unless that intention is apparent") (footnote omitted); *Ashland Drilling, Inc. v. Jackson County*, 168 Or App 624, 634, 4 P3d 748, *rev den* 331 Or 429 (2000) ("In general, where local governments have

undertaken reasonably to regulate matters of local health, safety, and welfare, such regulation will be valid unless we determine that the local regulation conflicts with state law or is clearly intended to be preempted.").

The Supreme Court's opinion in *Multnomah Kennel Club* is instructive in that regard. In that case, the county imposed a business income tax on pari-mutuel racing establishments. The plaintiff kennel club challenged the authority of the county to do that, arguing that state law preempted the taxation of racing establishments. According to the kennel club, existing state statutes prescribed license fees and privilege taxes and declared that those fees and taxes "shall be in lieu of all other licenses and privilege taxes" imposed by a county, city, or other municipality for the privilege of conducting race meets. The court held that the statute did not preempt the county from imposing a business income tax:

> "The state is deemed to have exercised its power to preempt a field only where the intent to do so is apparent. Had the legislature intended to foreclose local income taxation of pari-mutuel racing establishments, it could and should have given explicit direction to that effect."

*Multnomah Kennel Club,* 295 Or at 287 (citation omitted). The court narrowly construed the existing statutes to preempt only municipal license fees and privilege taxes, not business income taxes. *Id.*

In this case, nothing in ORS chapter 759 expressly preempts local governments from imposing registration and license fees for the use of local rights-of-way. The chapter contains none of the usual declarations of preemptive intent ("the state hereby preempts" or "no local government shall").

AT&T Communications and AT&T Wireless concede that much. They nevertheless contend that preemptive intent is adequately expressed in ORS 759.030(1), which provides, in part:

> "[T]he Public Utility Commission shall have authority to determine the manner and extent of regulation of telecommunications services within the State of Oregon."

According to the companies, that statute clearly gives the PUC "the exclusive authority" to determine the manner and

extent of regulation of telecommunications services in Oregon.

We reject that reading of ORS 759.030 for several reasons. First, that is not what the statute says. While it confers authority on the PUC, it does not expressly confer *exclusive* authority on the PUC. It certainly does not amount to what the cases require in terms of a clear and unequivocal statement of preemptive intent. Moreover, the statute merely confers on the PUC the authority to determine the "manner and extent" of regulation of telecommunications services within the state. Neither AT&T Communications nor AT&T Wireless have cited any administrative regulation by which the PUC actually has exercised that authority and determined that the "manner and extent" of regulation of telecommunications in Oregon precludes the local government regulation at issue in this case, and we are aware of none.

Second, other statutes suggest that the legislature intended not exclusive state regulation of telecommunications service in Oregon, but rather concurrent state and local government regulation. ORS 759.570, for example, provides that the state regulation of telecommunications services through the allocation of service territories "shall not be construed or applied to restrict the powers granted to cities to issue franchises" to providers of telecommunications services, by which local governments have been regulating the provision of telecommunications services within their boundaries for many years. Indeed, neither AT&T Communications nor AT&T Wireless contend that the city's current franchise agreements with telecommunications companies are invalid. The companies do not explain—and we do not understand—why the city is authorized to regulate telecommunications service providers through individual franchise agreements, but it is not authorized to accomplish similar regulation of the same telecommunications service providers through the adoption of a uniform ordinance.

Also, ORS 756.200 provides that the remedies and enforcement procedures spelled out in ORS chapters 756, 757, 758, and 759 "do not release or waive any right of action by the state or by any person for any right, penalty or forfeiture which may arise under any law of this state *or under an*

*ordinance of any municipality thereof."* (Emphasis added.) Clearly, the legislature assumes that there are municipal ordinances that may concurrently apply with provisions of ORS chapters 756, 757, 758, and 759.

Likewise, ORS 221.415 expressly recognizes the "independent basis" of municipal authority to regulate the use of local rights-of-way and "reaffirm[s] the authority of cities to regulate use of municipally owned rights of way." The statute goes on expressly to confirm the authority of any city to charge telecommunications carriers for the use of local rights-of-way. ORS 221.450.[5]

In short, nothing in ORS chapter 759 suggests that the legislature intended to preempt entirely municipal control of the provision of telecommunications services. To the contrary, that chapter and other related statutory provisions make clear that the legislature intended municipalities to retain the authority to regulate the use of their rights-of-way within their boundaries and to require the payment of registration and right-of-way license fees.

■ *Violation of Former Article XI, Section 11g, of the Oregon Constitution*

AT&T Communications and AT&T Wireless next contend that the registration and license fees are invalid, because they were enacted during the short life of *former* Article XI, section 11g, of the Oregon Constitution, which barred local governments from shifting services from being financed by property taxation to being financed by some other form of taxation. According to the companies, the city *could* use revenues generated by the registration and license fees to fund services that once were funded by property taxation. The companies acknowledge that, by the time they initiated this action, Article XI, section 11g, had been repealed.

---

[5] We also note that, although no party has cited the enactment to us, in 1999, the legislature created "a joint government and industry task force for the purpose of studying use of public rights of way and the payment of fees and other forms of compensation by telecommunications providers to local governments." Or Laws 1999, ch 436, § 1(2) (codified as note following ORS 759.080). The fact that the legislature created the task force to study the very issues in dispute in this case suggests that the legislature does not regard its existing statutes as wholly preemptive, as the companies contend.

They nevertheless contend that, because the city ordinance was enacted during the time when that portion of the constitution was in effect, the ordinance was void *ab initio*.

The city argues that the constitutional limitation does not apply because, by the time the companies initiated this action, it was repealed. In any event, the city argues, there is no evidence that the city actually has used or intends to use funds generated by the registration or license fees to pay for services previously funded by property taxation.

*Former* Article XI, section 11g(8)(a), of the Oregon Constitution, provided:

> "No government product or service that on or after June 30, 1995 was wholly or partially paid for by ad valorem property taxes, shall be shifted, transferred, or otherwise converted so as to be wholly or partially paid for by a fee, assessment, or other charge except state income taxes, without prior voter approval."

The provision was enacted as part of Ballot Measure 47, which was enacted by the voters on November 5, 1996. Six months later, however, the voters repealed Ballot Measure 47 when they enacted Ballot Measure 50, on May 20, 1997.

There is some question, as the city suggests, whether Article XI, section 11g, even may be enforced at this point. By the time that AT&T Communications and AT&T Wireless initiated this action, Ballot Measure 47 had been repealed. Generally, the effect of a repeal is to invalidate the repealed provision *ab initio*, as if it never had effect. *See Strode v. Washer*, 17 Or 50, 56 (1888) ("[t]he repeal [of a statute] obliterates the statute as completely as though it had never been passed"); *see also* 1A *Sutherland Statutory Construction* § 23.33, 424 (5th ed 1992) ("The effect of the repeal of a statute * * * is to destroy the effectiveness of the repealed act in futuro and to divest the right to proceed under the statute. Except as to proceedings past and closed, the statute is considered as if it had never existed.").

In any event, nothing in the city's ordinance itself violates *former* Article XI, section 11g. The ordinance does not require the city to use revenues generated from the registration or license fees to pay for services previously funded

by property taxation. The best that AT&T Communications and AT&T Wireless have to offer is that, under the ordinance, the city *could* use the revenues in violation of *former* Article XI, section 11g. That, however, is not sufficient to prevail on their facial challenge to the validity of the ordinance. *Advocates for Effective Regulation v. City of Eugene*, 160 Or App 292, 299, 981 P2d 368 (1999) (in a facial challenge, "the question is whether the challenged enactment is valid as written, as opposed to validly applied to a given set of facts"). Even assuming that the companies are asserting an as-applied challenge, the fact remains that nothing in the record of this case suggests that the city ever had or currently has the intention to apply funds in violation of *former* Article XI, section 11g.

■ *Violation of Article IX, Section 3, of the Oregon Constitution*

AT&T Communications and AT&T Wireless also argue that the ordinance violates Article IX, section 3, of the Oregon Constitution, because it fails adequately to state the purposes to which the revenues it generates will be put. The city replies that the findings that are contained in the ordinance are constitutionally sufficient.

Article IX, section 3, of the Oregon Constitution, provides:

> "No tax shall be levied except in accordance with law. Every law imposing a tax shall state distinctly the purpose to which the revenue shall be applied."

The text of that provision does not make clear whether it applies to taxes levied by local governments, and the cases are divided on the point. *Compare Miller v. Henry*, 62 Or 4, 10, 124 P 197 (1912) (Article IX, section 3, applies only "to taxes levied by law for general State purposes, * * * 'and not to local taxes for local purposes.' ") (citation omitted), *with School Dist. No. 61 v. School Dist. No. 32*, 53 Or 33, 35, 98 P 523 (1908) (applying Article IX, section 3, to tax levied by local school district). There also is some question whether the provision applies to all taxes. For example, it has been held

that, if the purpose of a tax is regulatory, and not merely revenue raising, Article IX, section 3, does not apply at all. *Starker v. Scott et al.*, 183 Or 10, 15-17, 190 P2d 532 (1948).

■ Even assuming for the sake of the argument that Article IX, section 3, applies to this case, the findings contained in the city's telecommunications ordinance suffice. As we have noted, those findings explain that the purpose of the registration fee is to pay for the costs of the regulatory program itself, as well as a number of programs related to enhancing the telecommunications infrastructure of the city. The findings also explain that the license fee is intended to compensate the city for the use of its rights-of-way and to cover other costs associated with the use of those rights-of-way. AT&T Communications and AT&T Wireless complain that those findings are inadequate, but other than the bare conclusion, they offer no explanation as to why that is so. We reject their contention without further discussion.

B. *Federal Law Claims*

■ The Supremacy Clause of the United States Constitution, Article VI, clause 2, invalidates state or local laws "interfering with, and being contrary to," federal law. *Gibbons v. Ogden*, 22 US (9 Wheat) 1, 210, 6 L Ed 23 (1824); *see also Cipollone v. Liggett Group, Inc.*, 505 US 504, 516-17, 112 S Ct 2608, 120 L Ed 2d 407 (1992) (state law that conflicts with federal law is "without effect"). Congress is authorized to preempt state or local law in any of several ways, including by expressly stating its intention to do so. *Jones v. Rath Packing Co.*, 430 US 519, 525, 97 S Ct 1305, 51 L Ed 2d 604 (1977). In this case, AT&T Communications and AT&T Wireless contend that Congress expressly has preempted the city's telecommunications ordinance in two different statutes.

### 1. *Violation of 47 USC § 253*

AT&T Communications and AT&T Wireless first contend that the city's telecommunications ordinance violates section 253 of the Federal Telecommunications Act of 1996, 47 USC § 253 (Supp 2001), which they read broadly to

preempt all local government regulation of telecommunications service except nondiscriminatory charges for rights-of-way that do no more than cover costs incurred by local governments in providing rights-of-way. According to the companies, in this case, the city's registration and license fees are not so limited and therefore are preempted.

The city argues that the 1996 Act by its terms prohibits only state or local laws that prohibit or have the effect of prohibiting telecommunications providers from providing telecommunications service. In this case, the city argues, its telecommunications ordinance merely imposes a requirement that all telecommunications service providers complete a registration application, pay a registration fee, and compensate it for the use of its rights-of-way. That, argues the city, does not have the effect of prohibiting the provision of telecommunications service.

AT&T Communications and AT&T Wireless insist that the 1996 Act is not so limited in its effect, but, in any event, they argue that the registration process indeed does amount to a prohibition of entry within the meaning of the federal telecommunications statute.

 Express preemption by federal statute is essentially a matter of statutory construction; our task is to determine whether Congress intended to preempt the type of state or local law at issue. *Shaw v. Delta Air Lines, Inc.*, 463 US 85, 95, 103 S Ct 2890, 77 L Ed 2d 490 (1983); *see also Shaw v. PACC Health Plan, Inc.*, 322 Or 392, 398-400, 908 P2d 308 (1995) (applying federal law). To determine the intended meaning of a federal statute, we examine its text and structure and, if necessary, its legislative history. *Department of Revenue of Ore. v. ACF Industries, Inc.*, 510 US 332, 339-46, 114 S Ct 843, 127 L Ed 2d 165 (1994); *see also Northwest Airlines, Inc. v. Dept. of Rev.*, 325 Or 530, 538, 943 P2d 175 (1997) (applying federal law).

The Federal Telecommunications Act of 1996 provides, in part:

"(a) In general

"No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of

prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

"(b) State regulatory authority

"Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis * * * requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

"(c) State and local government authority

"Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and non-discriminatory basis, * * * if the compensation required is publicly disclosed by such government."[6]

47 USC § 253(a)-(c) (Supp 2001).

The statute thus consists of two parts. First, in subsection (a) there is a prohibition: "No state or local statute or regulation * * * may prohibit * * *." Second, in subsections (b) and (c), there are two exceptions to the prohibition; both declare that "[n]othing in this section shall affect" the authority of state or local governments to impose certain regulations in spite of the prohibition of subsection (a). Reading the statute in that fashion suggests that our proper course is first

---

[6] There is some question whether there exists a private right of action to enforce section 253. *Compare TCG Detroit v. City of Dearborn*, 206 F3d 618, 623 (6th Cir 2000) (concluding that Congress implicitly created a private right of action), *with GST Tucson Lightwave, Inc. v. City of Tucson*, 950 F Supp 968, 970-71 (D Ariz 1996) (concluding that Congress did not intend to create a private right of action). At least one court has concluded that the question is one of subject matter jurisdiction that must be addressed even when ignored by the parties, *TCG Detroit*, 206 F3d at 622, and at least one other court has concluded that the question is not one of subject matter jurisdiction and may be waived by the parties, *Bellsouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F3d 1169 (11th Cir 2001). In *Northwest Airlines, Inc. v. County of Kent*, 510 US 355, 365, 114 S Ct 855, 127 L Ed 2d 183 (1994), however, the United States Supreme Court declared that "[t]he question whether a federal statute creates a claim for relief is not jurisdictional." In this case, the parties did not raise the issue whether section 253 creates a private right of action. Therefore, in accordance with *Northwest Airlines*, we do not address it.

to determine whether the city's telecommunications ordinance has the effect of prohibiting the ability to provide telecommunications services. If it does not, then our inquiry ends. If it does, then we proceed to determine whether, even if the ordinance has the effect of a prohibition, it nevertheless falls within one of the two exceptions stated in subsections (b) or (c).

At least that is what the text of the statute suggests. There has emerged a divergence of opinion in the case law, however, as to whether the statute should be interpreted in accordance with what its bare language appears to declare. A number of federal courts have construed the first three subsections of section 253 to operate as independent limitations on the authority of state and local governments. According to those decisions, subsection (a) prohibits state and local regulations that prohibit or have the effect of prohibiting the provision of telecommunications services. Subsection (b) then *by negative implication* provides a second, independent, prohibition, namely, that state governments can do no more than impose competitively neutral regulations that advance universal service and protect public safety and welfare. In other words, according to those decisions, when Congress states that "[n]othing in this section shall affect the ability of a State" to take certain action, Congress intended to limit the authority of the states to that action and only that action. Similarly, according to those decisions, when subsection (c) states that "[n]othing in this section affects the authority of a state or local government to manage the public rights-of-way," Congress intended to restrict the authority of states and local governments to the management of rights-of-way. *See, e.g., TCG Detroit v. City of Dearborn*, 977 F Supp 836, 839 (ED Mich 1997), *aff'd* 206 F3d 618 (6th Cir 2000) (finding an implied right of action to enforce section 253(c) as an independent prohibition); *Bell Atlantic-Maryland v. Prince George's County*, 49 F Supp 2d 805, 817 (D Md 1999), *rev'd on other grounds* 212 F3d 863 (4th Cir 2000) (concluding that section 253(c) limits local government authority to the management of local rights-of-way).[7]

_____

[7] AT&T Communications and AT&T Wireless cite several other decisions, all of which have since been vacated because of subsequent changes in state law. *AT&T Communications v. City of Austin Tx.*, 42 F Supp 2d 708 (SD Tex 1998),

Other courts have taken the view that the text of section 253 is not so elastic and that subsections (b) and (c) are not independent, substantive prohibitions, but rather, are "safe harbors" that are implicated only once it has been determined that a state or local regulation violates subsection (a) by prohibiting or having the effect of prohibiting the ability to provide telecommunications service. *See, e.g., City of Auburn v. Qwest Corp.*, 260 F3d 1160, 1175 (9th Cir 2001), *petition for cert filed* (US October 9, 2001) (characterizing section 253(c) as a "safe harbor" provision); *BellSouth Telecommunications v. Town of Palm Beach*, 252 F3d 1169, 1188 (11th Cir 2001) ("it is clear that (b) and (c) are exceptions to (a), rather than separate limitations on state and local authority"); *TCG New York, Inc. v. City of White Plains, N.Y.*, 125 F Supp 3d 81, 89 (SDNY 2000) (concluding that section 253(c) is a "safe harbor" that comes into play only upon a showing that section 253(a) has been violated).

We also note that the Federal Communications Commission (FCC), charged with the enforcement of section 253, has interpreted the statute in the latter fashion. In 1998, the agency issued "Suggested Guidelines for Petitions for Ruling under Section 253 of the Communications Act." 13 FCC Rcd 22970 (1998). In those guidelines, it stated:

"In preparing their submissions, parties should address as appropriate all parts of section 253. In particular, parties should first describe whether the challenged requirement falls within the proscription of section 253(a); if it does, parties should describe whether the requirement nevertheless is permissible under other sections of the statute, specifically sections 253(b) and (c)."

*Id.* at 22971. Moreover, in carrying out its enforcement authority, that is the manner in which the agency has applied the statute. *See, e.g., In the Matter of The Missouri Municipal League*, 16 FCC Rcd 1157 (2001); *In the Matter of The Petition of the State of Minnesota*, 14 FCC Rcd 21697 (1999); *In the Matter of The Public Utility Commission of Texas*, 13 FCC Rcd 3460, 3480-81 (1997).

---

*vacated* 235 F3d 241 (5th Cir 2000); *AT&T Commun. of the Southwest v. City of Dallas*, 52 F Supp 2d 763 (ND Tex 1999), *vacated* 243 F3d 928 (5th Cir 2001); *AT&T Communications v. City of Dallas*, 8 F Supp 2d 582 (ND Tex 1998), *vacated* 243 F3d 928 (5th Cir 2001).

■ For at least four reasons, we conclude that the better-reasoned cases hold that subsection (a) operates as a prohibition, while subsections (b) and (c) operate as "safe harbor" provisions. First, and most important, as we already have noted, the text of the statute itself plainly refers only to subsection (a) as a prohibition. Subsections (b) and (c), in contrast, both begin with the phrase "[n]othing in this section shall affect." They are, by their own terms, exceptions to subsection (a), not independent substantive prohibitions.

■ The only possible justification for reading subsections (b) and (c) as substantive prohibitions is the textual maxim *expressio unius est exclusius alterius*. That maxim, however, may operate only to explain a text, not to contradict it. *Neuberger v. Commissioner,* 311 US 83, 88, 61 S Ct 97, 85 L Ed 58 (1940) ("The maxim *expressio unius est exclusio alterius* is an aid to construction, not a rule of law. It can never override clear and contrary evidence of Congressional intent."). Indeed, in this case, the application of that maxim effectively makes surplusage of section (a), for if, indeed, subsections (b) and (c) describe the total universe of permissible state and local government regulation, subsection (a) serves no purpose.

Second, the 1996 Act itself declares that it is not to be interpreted to have implicitly preemptive effect. Section 601(c)(1) expressly declares that it "shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided." Pub L 104-104, § 601(c), 110 Stat 143 (1996) (reprinted as note to 47 US § 152).

Third, other sections of the 1996 Act make clear that Congress did not intend subsections (b) or (c) to describe the limits of state and local government regulatory authority. Section 252, for example, relates to agreements between providers of telecommunications services. It provides:

"[S]ubject to section 253 of this title, nothing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements."

47 USC § 252(e)(3) (Supp 2001). Similarly, section 261 expressly recognizes the authority of states to impose requirements to further competition, so long as those requirements are not inconsistent with any other provision of the statute. 47 USC § 261(c) (Supp 2001).

Fourth, the FCC construes subsection (a) as the only substantive prohibition on state and local governments and subsections (b) and (c) as exceptions to that prohibition. As the agency charged with implementing the 1996 Act, its views on the interpretation of section 253 are entitled to substantial deference. *Olmstead v. L. C.*, 527 US 581, 598, 119 S Ct 2176, 144 L Ed 2d 540 (1999); *Chevron USA, Inc. v. Natural Res. Def. Council*, 467 US 837, 844, 104 S Ct 2778, 81 L Ed 2d 694 (1984).[8]

In addressing the preemption claim of AT&T Communications and AT&T Wireless, therefore, we first address whether the city's telecommunications ordinance prohibits or has the effect of prohibiting the provision of telecommunications services in violation of section 253(a). If it does not, then our inquiry ends, and the ordinance survives scrutiny. If the ordinance does have the prohibited effect, then we proceed to the question whether it nevertheless is saved by one of the applicable statutory exceptions.

Precisely what constitutes a violation of section 253(a) is not spelled out in the statute itself. From the text of

---

[8] We note that, in *Bellsouth Telecommunications, Inc.*, the Eleventh Circuit relied on an additional consideration, namely, legislative history. 252 F3d at 1188-89. The court noted that, during the Senate debate concerning the Act, Senator Hollings explained that subsections (b) and (c) were intended to preserve, rather than to limit, state and local government authority. *Id.* at 1189. Our review of the legislative history, however, reveals other statements of other members that suggest that the authority that was preserved to the state and local governments may have been limited. For example, Senator Feinstein offered examples of the types of restrictions that Congress intended to permit under section 253(c). She listed regulating time or location of excavation of rights-of-way, regulating the manner of use of rights-of-way, requiring providers to pay fees to cover the costs of street repairs and paving associated with construction on rights-of-way, the enforcement of local zoning regulations, and requiring providers to indemnify cities against claims of injury arising out of excavation of rights-of-way. 141 Cong Rec S 8172. Of course, listing examples of what types of authority the statute preserves does not necessarily mean that the statute does not preserve authority in additional ways. Logically, the list could as easily be indicative as exhaustive. We conclude that, as so often is the case, the legislative history is at best equivocal and not particularly helpful in determining the intended meaning of the statute.

the statute, however, this much is clear. First, if a local government regulation expressly prohibits a provider from offering telecommunications services, section 253(a) may be violated. Second, even if the regulation does not expressly prohibit the provision of telecommunications services, it may be sufficiently burdensome as to effectively accomplish the same result.

We note that, in carrying out its enforcement obligations under the statute, the FCC has taken precisely that approach. It begins by determining whether a challenged regulation expressly prohibits the provision of telecommunications services. It then proceeds to an examination of the record of each particular case to determine whether the individual or entity challenging the local regulation has demonstrated that it has the necessary prohibitive effect. *See, e.g., In the Matter of California Payphone Association*, 12 FCC Rcd 14191 (1997). In determining whether a local ordinance has the effect of prohibiting the provision of telecommunications services, the FCC considers

> "whether the Ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment."

*Id.* at 14206. It bears emphasis that the FCC requires parties challenging a local telecommunications regulation to "supply * * * credible and probative evidence that the challenged requirement falls within the proscription of section 253(a)." *In the Matter of TCI Cablevision of Oakland County, Inc.*, 12 FCC Rcd 21396, 21440 (1997).[9]

Courts examining the issue have determined that, on the basis of the records before them, certain local ordinances or regulatory practices have the proscribed effect. In *TCG New York, Inc.*, for example, the District Court for the

---

[9] Among other things, the FCC requires petitioners to address what specific telecommunications services that they are effectively prohibited from providing, what other specific entities are prohibited from providing those services, what groups of actual or potential customers are being denied access to the service or services, what factual circumstances cause petitioners to be denied the ability to offer the service or services—including whether the challenged regulation is discriminatory and whether price levels in the market preclude recovery of any such additional costs. *Suggested Guidelines for Ruling Under Section 253 of the Federal Telecommunications Act*, 13 FCC Rcd at 22971-72.

Southern District of New York held that a complex franchise application process that took over seven years to complete amounted to an effective prohibition in violation of section 253(a). 125 F Supp 2d at 88-89.

Courts also have determined that, in some cases, regulatory requirements constitute an effective prohibition as a matter of law. In *City of Auburn*, for example, the Ninth Circuit held that a local ordinance that gave the city the unfettered discretion to deny telecommunications franchise applications amounted to an effective prohibition that violated section 253(a). 260 F3d at 1176. The District Court for the District of Maryland similarly held that "the County's decision to grant or deny a franchise may not be left to the County's ultimate discretion." *Bell Atlantic-Maryland,* 49 F Supp 2d at 816.

On the other hand, courts also have rejected the suggestion that the mere requirement that a provider complete a franchise application and pay a fee is not sufficient to violate section 253(a) as a matter of law. *See, e.g., TCG Detroit*, 206 F3d at 624 ("The provider must apply for a franchise; the City assesses a franchise fee; no fee paid, no franchise given. That cannot 'be described as a prohibition [within the meaning of section 253(a)].' ") (citation omitted).

In this case, AT&T Communications and AT&T Wireless do not contend that the city's telecommunications ordinance expressly prohibits anyone from providing telecommunications services. They do argue, however, that the ordinance has the effect of prohibiting the provision of telecommunications services for several reasons.

First, the companies contend that permitting local governments to engage in any regulation of telecommunications services beyond the use of local rights-of-way will lead to a "patchwork" of varying local regulations that will constitute a "virtually insurmountable" barrier to entry into the market. According to AT&T Communications and AT&T Wireless, "[l]ocal ordinances almost certainly will vary from city to city, and a carrier likely would be forced to obtain multiple permits to serve a single metropolitan area." That argument, however, amounts to little more than speculation about the possible effect of the city's telecommunications

ordinance on the industry generally. It is buttressed by no evidence about the actual or likely effect of the city's ordinance on them or any other particular telecommunications providers. Moreover, their argument presumes that the only legitimate regulatory domain of local governments is the control of rights-of-way, a presumption that cannot be squared with the language of the statute, as we have held.

Second, the companies contend that the registration and license fees are effective prohibitions because they are greater than necessary to compensate the city for the use of its rights-of-way. Once again, however, the argument presumes—erroneously—that the only legitimate exercise of local regulatory authority under section 253(a) is the recovery of the costs of the use of local rights-of-way.

Third, the companies argue that the licensing procedures required by the ordinance

> "impose a redundant third layer of regulation on AT&T Wireless and AT&T Communications that impedes their ability to compete and imposes unnecessary delay in the provision of new services, in violation of section 253(a)."

The companies still offer nothing to substantiate their complaint. They contend that the licensing procedure is "redundant" in that it requires applicants to demonstrate that they are financially, legally, and technically qualified to provide service when state and federal authorities already require them to do so. Even assuming that they are correct in that regard, it is not easy to understand how being required to satisfy a requirement that the companies contend they already have satisfied constitutes an effective prohibition of their ability to provide services. Similarly, the companies complain that the licensing procedures impede their ability to compete, but they fail completely to explain why that is so. In fact, the companies fail to define the relevant markets within which they compete, much less identify what it is about the licensing procedures that adversely affects, or even has the reasonable likelihood of adversely affecting, their ability to compete within them. Likewise, there is no evidence in the record about any delay in the companies' application processes, much less a delay of sufficient duration to constitute an effective prohibition.

In short, AT&T Communications and AT&T Wireless complain that the city's telecommunications ordinance has the effect of a prohibition, but they do not demonstrate that such is the case. We therefore conclude that the ordinance does not violate section 253(a) of the Federal Telecommunications Act of 1996. Because we conclude that the ordinance does not violate section 253(a), we need not address the parties' arguments about whether it falls within the safe harbor provisions of subsections (b) or (c).

2. *Violation of 47 USC § 332(c)(3)(A)*

Finally, AT&T Wireless contends that the city's telecommunications ordinance violates section 332 of the Federal Telecommunications Act. 47 USC § 332 (1991 & Supp 2001). According to AT&T Wireless, the Act preempts state and local regulation of entry and rates charged for commercial mobile radio services, which include cellular telecommunications services. The company contends that the registration and licensing requirements both constitute regulations of entry, in violation of the federal law.

The city argues that neither the registration nor the licensing requirement amounts to a regulation of entry; rather, both constitute regulations of the "terms and conditions" of providing commercial mobile radio services, as expressly permitted by section 332.

Before 1993, the FCC distinguished between common carrier service and private carrier service, regulating the former considerably more than the latter. Problems arose as new telecommunications technologies blurred distinctions between common and private carriers. *See generally* Second Report and Order, *Implementation of Sections 3(n) and 332 of the Communications Act*, 9 FCC Rcd 1411, 1414-16 (1994).

Against that backdrop, in 1993, Congress enacted section 332 of the Federal Communications Act to "replace[ ] traditional regulation of mobile services with an approach that brings all mobile service providers under a comprehensive, consistent regulatory framework." *Id.* at 1417. First, the new law eliminated the previous classifications of service in favor of two new ones: "commercial" mobile radio services and "private" mobile radio services. As pertinent to this case,

commercial mobile radio services include all mobile services operated for profit that solicit subscribers and are interconnected with the public switched network, including cellular telecommunications services. 47 USC § 332(d)(1), (2) (Supp 2001). Second, the new law preempted certain aspects of the state or local regulation of both commercial and private mobile radio services:

> "[N]o State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services."

47 USC § 332(c)(3)(A) (Supp 2001). The statute does not define what it means by the "terms and conditions" that states may continue to regulate. The House Committee Report, however, explains what the Committee intended in some detail:

> "It is the intent of the Committee that the states still would be able to regulate the terms and conditions of these services. By 'terms and conditions,' the Committee intends to include such matters as customer billing information and practices and billing disputes and other consumer protection matters; facilities siting issues (*e.g.,* zoning); transfers of control; the bundling of services and equipment; and the requirement that carriers make capacity available on a wholesale basis or such other matters as fall within a state's lawful authority. This list is intended to be illustrative only and not meant to preclude other matters generally understood to fall under 'terms and conditions.' "

H Rep No 103-111, 103rd Cong, 1st Sess, *reprinted in* 1993 US Code Cong & Ad New, 378, 588.

In applying this provision, the FCC has concluded that its preemptive scope is narrow and applies only to local or state government regulations that control entry or rates. All other local or state regulations amount to permissible regulations of "other terms and conditions." Thus, for example, the agency concluded that the mere imposition of a "universal service" tax as a condition of providing service in a given area does not amount to a regulation of entry or rates. *In the*

*Matter of Petition of Pittencrieff Communications, Inc.*, 13 FCC Rcd 1735, 1737 (1997).

The FCC's construction of section 332 was upheld in *Cellular Telecommunications Industry v. F.C.C.*, 168 F3d 1332 (DC Cir 1999). The association challenging the tax argued that it amounted to rate regulation because it increased providers' costs, thus affecting rates. The court adopted the FCC's rejection of the argument:

> "To equate state action that may increase the cost of doing business with rate regulation would, the Commission reasonably concluded, forbid nearly all forms of state regulation, a result at odds with the 'other terms and conditions' portion of the [statute]."

*Id.* at 1336.

The association also argued that the universal service tax must be regarded as an impermissible entry or rate regulation, because it did not clearly fall within the class of regulations that were expressly exempted from preemption. The court rejected that argument, too, commenting that language of exemption "does not preempt and it does not forbid. Just the opposite." *Id.* at 1335. Merely because a given regulation does not fall neatly within an exception, the court held, does not mean that it is preempted. It is only preempted if it falls within the scope of the portion of the statute that contains language of preemption. *Id. See also Sprint Spectrum v. State Corp. Com'n of Kansas*, 149 F3d 1058 (10th Cir 1998) (upholding validity of universal service tax as against challenge under section 332).

In this case, AT&T Wireless challenges the city's registration requirement, the payment of a registration fee, and the right-of-way license and fee as regulations of entry.[10] We conclude that none qualifies as a regulation of entry within the meaning of the statute.

█ We begin with the registration requirement. The city's telecommunications ordinance and its implementing

---

[10] At least that is what we understand the company to argue. Its brief is not at all clear in explaining precisely how the city's ordinance violates section 332.

regulations require all telecommunications providers to complete a registration form that identifies the name and address of the provider and a description of the services to be provided, along with the location of any communications facilities to be used. The company has cited no authority for the proposition that requiring all providers to supply minimal information to the city amounts to a regulation of entry within the meaning of the statute, and we have found none.

■ We turn to the registration fee. It is a uniform, nondiscriminatory fee that applies to all providers "to implement programs that will advance universal service and the quality of telecommunications services and to protect the rights of consumers." In that regard, it is analogous to the universal service taxes that, in *Cellular Telecommunications* and *Sprint Spectrum,* were found to be permissible regulations of the "terms and conditions" of providing cellular telecommunications services. AT&T Wireless insists that those decisions are distinguishable because the "terms and conditions" exception on which those decisions rely applies only to states, not to terms and conditions imposed by local governments. In other words, the company argues, because the city's registration fee does not fall precisely within an exception to the statement of preemption in section 332, it is implicitly preempted. That is precisely the argument that the D.C. Circuit Court of Appeals rejected in *Cellular Telecommunications,* 168 F3d at 1335. We conclude that the court's reading of the statute is persuasive, and that AT&T Wireless's is not, for several reasons.

First, to read section 332 as AT&T Wireless suggests would expand its preemptive effect well beyond the language that Congress employed. As the court in *Cellular Telecommunications* emphasized, there is a difference between language of preemption and language of exception. The only language of preemption in section 332 concerns: (1) entry and (2) rates. Nothing else is expressly preempted. To read the statute as AT&T Wireless suggests would convert language of exception into an implicit creation of a third category of preemption, so that, as to local governments, the statute effectively would preempt: (1) entry; (2) rates; and (3) everything else. That is simply not what the statute says.

Second, as we previously have noted, section 601(c)(1) of the Federal Telecommunications Act itself cautions against interpreting it to have implicit preemptive effect. Similarly, 47 USC § 221(b) declares that

> "nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service, * * * in any case where such matters are subject to regulation by a State commission or by local governmental authority."

47 USC § 221(b) (1991).

Third, the text of section 332 itself suggests that Congress did not intend to preempt local government regulation of "other terms and conditions" of service. The section provides that states retain authority to regulate "other terms and conditions." As we have noted, included within the meaning of "other terms and conditions" are "facilities siting issues (e.g., zoning)." The section goes on to provide, however, that zoning authority is expressly reserved to *both* "State or local government[s] or instrumentalit[ies] thereof." 47 USC § 332(c)(7)(A) (Supp 2001). Thus, it is clear that, merely because the statute recognizes that states retain authority to regulate "other terms and conditions," it does not necessarily mean that local governments do not also retain the same authority.

Last, and certainly not least, the court's construction of the statute in *Cellular Telecommunications* is supported by the FCC's own construction of the Federal Telecommunications Act, which is entitled to substantial deference. *Olmstead*, 527 US at 598; *Chevron USA*, 467 US at 844. Perhaps there are other plausible readings of the statutory language. The fact remains that the agency's construction is at least reasonable, and that, as a matter of federal statutory construction law, ends the matter.

That leaves the right-of-way license and fee. The city's telecommunications ordinance imposes certain conditions on the use of its own property for the purpose of providing telecommunications services and requires users to pay a fee for the privilege. That certainly is not a regulation of

entry. Telecommunications service providers do not necessarily use city rights-of-way to provide their services. Moreover, nothing in the Federal Telecommunications Act suggests that Congress intended to preempt local governments from regulating and charging for the use of their own rights-of-way. Every indication, in fact, is to the contrary. *See, e.g.,* 47 USC § 253(c) (Supp 2001) (affirming state and local government authority "to manage the public rights-of-way").

We conclude that the city's telecommunications ordinance is preempted by none of the state or federal laws on which AT&T Communications and AT&T Wireless rely. The trial court therefore erred in granting the companies' motion for summary judgment and in denying the city's motion.

Reversed and remanded for entry of judgment in favor of City of Eugene.