Argued and submitted August 4, 2003, reversed and remanded with instructions
January 28, 2004

# SPRINGFIELD UTILITY BOARD,
on behalf of the City of Springfield,
*Respondent,*

*v.*

# EMERALD PEOPLE'S UTILITY DISTRICT,
*Appellant.*

## 16-01-19121; A118530

84 P3d 167

Timothy J. Sercombe argued the cause for appellant. On the opening brief were William K. Kabeiseman and Preston Gates & Ellis LLP.

Peter R. Mersereau argued the cause for respondent. On the brief were Thomas W. McPherson and Mersereau & Shannon, LLP.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Judy C. Lucas, Assistant Attorney General, filed the brief *amicus curiae* for State of Oregon.

Lori Irish Bauman, Rochelle Lessner, and Ater Wynne LLP filed the brief *amicus curiae* for People's Utility District Association, Inc.

John H. Hammond, Jr., Carrie A. Richter, and Hutchinson, Hammond & Walsh filed the brief *amicus curiae* for Oregon Municipal Electric Utilities.

Before Edmonds, Presiding Judge, and Wollheim* and Schuman, Judges.

EDMONDS, P. J.

---

* Wollheim, J., *vice* Kistler, J., resigned.

## EDMONDS, P. J.

Defendant Emerald People's Utility District (Emerald) appeals from a summary judgment in this declaratory judgment action. ORS 28.010. The trial court held that plaintiff Springfield Utility Board (the board), acting on behalf of the city of Springfield (the city),[1] has the authority to exclude Emerald from providing electrical service to an area that the city annexed (the area in dispute). Most of the area in dispute is within Emerald's boundaries and its allocated service territory; the rest is subject to Emerald's application to add it to Emerald's allocated service territory.[2] We reverse as to the allocated territory.

The facts are not in dispute. Emerald was created after an election in 1978 for the purpose of providing electrical service to customers within its boundaries, which consist of unincorporated portions of Lane County and all or portions of several cities in the county, not including Springfield. At the time, there were no customers located in the area in dispute. In 1983, Emerald purchased, under the threat of condemnation, the transmission and distribution assets owned by Pacific Power & Light (PP&L), which had served Emerald's territory until that time, and began operations. The Public Utility Commissioner (PUC)[3] had previously allocated to PP&L the exclusive right to serve the territory that it sold to Emerald. After the sale, the PUC issued an order approving the sale and allocating the exclusive right to serve PP&L's former territory, including the majority of the area in dispute, to Emerald.

---

[1] The Springfield city charter in effect at the time of the board's action expressly gave it the authority to act on behalf of the city in all matters related to the electric, water, and gas property that the city owns, to do all things necessary and proper for their efficient operation and management, and to exercise the regulatory powers that ORS 221.420 grants cities and towns. Since then Springfield has adopted a "general powers" rather than "specified powers" charter. The change does not affect our analysis.

[2] The result of Emerald's application is not in the record.

[3] At the time, a single Public Utility Commissioner exercised the state's regulatory authority. Since then, the commissioner has been replaced by the Public Utility Commission, which consists of three members. The change does not affect the PUC's authority or the effect of its actions, nor does it affect the use of "PUC" as an acronym for the agency.

On November 8, 2000, the city annexed the area in dispute in order to permit a developer to develop the entire area as a residential subdivision. The city desires to be the sole supplier of electricity to all consumers within its limits, including the area in dispute. To further that policy, and in anticipation of the annexation, the board, acting on behalf of the city and exercising authority that it believed ORS 221.420(2)(a) gave it, adopted an ordinance that excluded Emerald from the entire area in dispute effective upon the area's annexation to the city. The board took that action on April 12, 2000. Emerald disputed the city's authority to exclude it from the area and began constructing facilities within the area in order to provide electrical power to it. The board then brought this action for a declaratory judgment and an injunction; Emerald counterclaimed for declaratory relief. Each party moved for summary judgment. The court granted the board's motion and denied Emerald's. Emerald appeals.

■ The essential issue in this case is whether a city has the authority to exclude a People's Utility District (PUD) from operating within the city's limits, both when the PUC has allocated the area in question to the PUD as part of its exclusive service territory and when it has not. Most of the issues involve the city's authority over allocated territory. The board provides a number of grounds to support its claimed authority to override the PUC's allocation. We begin with its argument that the city's constitutional home rule authority,[4] by itself, authorizes the city to exclude Emerald from all territory within its boundaries. The board emphasizes that the city has constitutional home rule authority while Emerald does not. It recognizes that the legislature can preempt city home rule powers where matters of statewide concern are implicated but argues that the legislature must clearly express its intent to do so. We reject the city's argument for the reasons that follow.

In *LaGrande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204, *adhered to on reh'g*, 284 Or 173, 586 P2d 765 (1978), the

---

[4] A city's home rule authority comes from two provisions in the Oregon Constitution that the people adopted in 1906, Or Const, Art XI, § 2, and Or Const, Art IV, § 1a (now § 1(5)).

Supreme Court established the current method for analyzing city home rule issues involving conflicts between state and local legislation. The court pointed out that the basic purpose of the home rule amendments was to allow the people of each city to decide the organization of their government and the scope of its powers without the need for legislative authorization. The amendments deal with the structure of a city's government, not with the substantive actions that that government is authorized to take. The home rule amendments "address the manner in which government power is granted and exercised, not the concrete uses to which it is put." *Id.* at 143.

 The constitutional amendments give a city home rule authority to determine how to grant and exercise its governmental power. Under that authority, the city may pursue the substantive policies that it thinks best, subject to state and federal constitutional limitations, without first obtaining legislative approval of its decisions. The city's authority to decide those matters for itself, however, does not affect the legislature's authority to act on the same substantive issues, even if that action is contrary to the city's action. Under such circumstances the state's enactment controls. "[W]hen a local enactment is found incompatible with a state law in an area of substantive policy, the state law will displace the local rule." *LaGrande/Astoria*, 281 Or at 149.[5] That does not mean that state legislation in a substantive area will automatically displace city policy in the same area. A local ordinance is not incompatible with state law simply because it imposes greater requirements than does the state, *see State ex rel Haley v. City of Troutdale*, 281 Or 203, 576 P2d 1238 (1978); *Oregon Restaurant Assn. v. City of Corvallis*, 166 Or App 506, 509-11, 999 P2d 518 (2000), nor because the ordinance and the state law deal with different aspects of the same subject, *see AT&T Communications v. City of Eugene*, 177 Or App 379, 390-91, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002). Rather, we generally assume that the legislature did not

[5] Except possibly for matters concerning local governmental structure, the applicability of the state law does not depend on whether the issue involves a matter of local concern or a matter of statewide concern. *LaGrande/Astoria*, 281 Or at 145-47.

mean to displace local regulation of a local condition unless its intent to do so is apparent. *Id.* at 395-97.

For its part, Emerald cites a number of cases that limit a city's home rule authority to require other governmental entities to carry out city policies and draws from them the general proposition that the city's charter authority does not include the power to regulate or prohibit the operations of another government. *See, e.g., City of Eugene v. Roberts*, 305 Or 641, 756 P2d 630 (1988) (city cannot require county clerk to conduct municipal elections on city's behalf). Those cases do not inform the issue before us. The board is not asking Emerald to carry out a city policy; rather, it seeks to exercise authority over territory previously allocated to Emerald's predecessor.

We conclude that the city's home rule powers are relevant to this case only to the extent that the board's actions do not conflict with state statutes. Before considering whether the city has home rule authority to exclude Emerald from serving the area in dispute, we must first decide the effect of the relevant statutes. If those statutes prohibit the city from excluding Emerald from its allocated territory, its home rule authority is irrelevant.[6] Such statutes express substantive state policy and, if they apply, override the city's home rule authority. We turn to the applicable statutes.

**7-10.** A PUD is a governmental entity, created by a vote of the electors in the PUD's territory, with broad authority to take actions necessary to provide electrical service, including the authority to tax and to issue bonds. Or Const, Art XI, § 12; ORS 261.200. It has authority to provide electricity both within and outside its territorial limits, but it does not necessarily have the exclusive right to serve either of those areas. *Douglas Electric v. Central Lincoln PUD*, 164 Or App 251, 991 P2d 1060 (1999), *rev den*, 331 Or 283 (2000). Only the PUC can award a PUD or other supplier of electricity the exclusive right to serve a particular territory. The PUC does so by allocating that territory to a particular person;[7] once it

---

[6] As we discuss below, we conclude that the statutes prohibit the board from excluding Emerald from serving its allocated territory but that they do not affect the city's authority under its home rule powers to exclude Emerald from the portion of the area in dispute that is not part of Emerald's allocated territory.

[7] For these purposes a "person" includes "individuals, firms, partnerships, corporations, associations, cooperatives and municipalities, or their agent, lessee, trustee or referee." ORS 758.400(2).

has done so, no other person may offer, construct, or extend utility service into the allocated territory. ORS 758.450(2). As we previously stated, the PUC has allocated to Emerald all of the territory within its political limits, including the major portion of the area in dispute, and Emerald has applied to the PUC to allocate the remaining portion of that area to it.

In attempting to exclude Emerald, the board relied on ORS 221.420(2)(a), which grants the city the authority to exclude a public utility from its territory and to serve that territory itself despite a PUC order allocating the territory to the public utility.[8] *See, e.g., PacificCorp v. City of Ashland*, 89 Or App 366, 370-72, 749 P2d 1189, *rev den*, 305 Or 594 (1988). The statute authorizes every city to:

> "Determine by contract or prescribe by ordinance or otherwise, the terms and conditions, including payment of charges and fees, upon which any public utility, electric cooperative, people's utility district or heating company may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any *public utility* or heating company therefrom."

(Emphasis added.) For the purposes of the statute, " '[p]ublic utility' has the meaning for that term provided in ORS 757.005." ORS 221.420(1)(a). The Springfield city charter expressly authorizes the board to exercise the city's authority under ORS 221.420(2)(a), and the board asserts that it properly exercised that authority when it excluded Emerald from providing service to the area in dispute.

In order for ORS 221.420(2)(a) to authorize the board's action, Emerald must be a "public utility" for the purposes of the statute. The wording of the statute itself raises questions about whether Emerald is a "public utility" within the meaning of ORS 221.420(2)(a). The statute distinguishes between PUDs, on the one hand, and public utilities, on the other, which would be unnecessary if a PUD were a public utility.[9] The statute contains two lists of the entities over

---

[8] This is how the parties treat the statute, although by its terms it refers only to the city's streets, highways, and other public property.

[9] We would normally begin our discussion of the meaning of a statutory phrase with the statutory definition. In this case, however, the analysis is clearer when we begin with the way the phrase relates to the rest of the statute and then turn to the definition in ORS 221.420(1)(a).

which a city has authority, each for a different purpose. First, a city may determine the terms and conditions by which a "public utility, electric cooperative, people's utility district or heating company" may occupy the city's streets or other public property. Second, a city may exclude a "public utility or heating company" from using its property. The statute thus distinguishes between public utilities and heating companies, on the one hand, and electric cooperatives and PUDs, on the other, giving the city greater authority over the former than the latter. A city may regulate the use of its streets and public property for all entities but may exclude only public utilities and heating companies from them. In order for the city to have authority to exclude Emerald, rather than simply to set the terms and conditions for its use of the city's property, Emerald must be a public utility in the statute's second use of the phrase, even though it apparently is not a public utility in the first use of the phrase. We turn to the meaning of the words "public utility" in the second use, beginning with the history of the adoption and amendment of the statute.

The legislature adopted what is now ORS 221.420 as section 61 of chapter 279 of the 1911 Oregon Laws (section 61). Chapter 279 as a whole created the state's first statewide regulation of public utilities other than railroads. Section 61 of chapter 279, which came near the end of the chapter, granted municipalities broad authority over public utilities within their boundaries. Under its provisions, municipalities could prescribe the character and quality of the products and services that public utilities furnished and the conditions under which utilities could occupy city streets, highways, and other public property. A municipality's exercise of its authority, however, was subject to state review for reasonableness. The chapter did not explicitly authorize a municipality to exclude a public utility from its property. Or Laws 1911, ch 279, § 61. In 1931, as part of the revision of the public utility laws, the legislature amended section 61; it deleted references to "municipality" and instead referred to "city and town," gave cities and towns express authority over utility rates, and gave them the authority to exclude or eject a public utility from their streets, highways, or other public property. Or Laws 1931, ch 103, § 8, *compiled as* OCLA § 112-461. Although the same legislature that amended section 61 also

adopted the statute that authorized the creation of PUDs, Oregon Laws 1931, chapter 279, it did not amend section 61 to refer to them.

The amended section 61, thus, did not give cities or towns any express authority over PUDs. When section 61 became ORS 221.420 upon the adoption of the Oregon Revised Statutes, the revisers moved it from its former position among statutes on the regulation of public utilities and placed it with statutes concerning cities' powers over local matters. As previously amended in 1931, ORS 221.420(2)(a) (1953) provided that every city may:

> "Determine by contract or prescribe by ordinance or otherwise, the quality and character of each kind of product or service to be furnished or rendered by any public utility, furnishing any product or service within such city, and all other terms and conditions upon which any public utility may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility therefrom."

Together with the remainder of ORS 221.420, the statute's focus remained on the city's authority to regulate most aspects of the provisions of public utility services, including rates. In 1971, the legislature amended the statute to modify the definitions, but subsection 2 of the statute remained unchanged.

The crucial change to ORS 221.420(2)(a) occurred in 1987, when the legislature amended it to add the current references to electric cooperatives and PUDs. Or Laws 1987, ch 245, § 2. After those amendments, the statute provided that every city may:

> "Determine by contract or prescribe by ordinance or otherwise, the [*quality and character of each kind of product or service to be furnished or rendered by any public utility, electric cooperative or people's utility district, furnishing any product or service within such city, and all other*] terms and conditions, **including payment of charges and fees,** upon which any public utility, **electric cooperative or people's utility district** may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility therefrom."

(Additional language in boldface; italicized and bracketed language deleted by subsequent statute at same session, Or Laws 1987, ch 628, § 1.)[10] By that action, the legislature indicated *its intention that electric cooperatives and PUDs*—neither of which are privately owned public utilities—be considered distinct from the public utilities that cities could already regulate. It gave cities the authority to regulate the services that PUDs furnished and the authority to establish the terms and conditions for their use of the city's property, including charging them for the privilege of that use. But the legislature did not authorize a city to exclude a PUD from its property; the city's authority to exclude continued to apply only to public utilities.

The legislature explained the reason for its action in section 1 of the session law, Oregon Laws 1987, chapter 245, section 1, which is now ORS 221.415:

"Recognizing the independent basis of legislative authority granted to cities in this state by municipal charters, the Legislative Assembly intends by ORS 221.415, 221.420, 221.450 and 261.305[11] to reaffirm the authority of cities to regulate use of municipally owned rights of way and to impose charges upon publicly owned suppliers of electrical energy, as well as privately owned suppliers for the use of such rights of way."

The legislature thus clearly distinguished between publicly owned suppliers of electricity (PUDs and cooperatives) and privately owned suppliers (public utilities) while, at the same time, it affirmed the authority of cities to regulate and impose fees on publicly owned suppliers as well as on privately owned suppliers. The clear implication of that distinction is that the legislature intended the words "public utility" in ORS 221.420 to refer only to privately owned suppliers.

---

[10] Several minor amendments brought ORS 221.420(2)(a) to its present form. Two separate statutes in 1989 added "telecommunications utility" and "heating company" to the list of entities that a city could both regulate and exclude. Or Laws 1989, ch 5, § 1; Or Laws 1989, ch 999, § 6. In 1999 the legislature deleted "telecommunications entity" from the statute. Or Laws 1999, ch 1093, § 6.

[11] As well as enacting ORS 221.415 and amending ORS 221.420, chapter 245 amended ORS 221.450 and ORS 261.305 to authorize cities to levy a privilege tax on PUDs as well as on privately owned public utilities and to authorize PUDs to enter into agreements with cities to pay fees for the use of city streets.

That implication gains force from the amendment to ORS 221.450 that was part of the same session law that amended ORS 221.420. Before the amendment to ORS 221.420, ORS 221.450 authorized a city to collect a privilege tax from "every privately owned public utility" that actually used the city's streets. After the amendment to ORS 221.420, ORS 221.450 authorized the city to collect that tax from "every electric cooperative, people's utility district *and* privately owned public utility[.]" Or Laws 1987, ch 245, § 3. (Emphasis added.) The combination of the express legislative distinction between publicly owned suppliers and privately owned public suppliers in ORS 221.450, together with the legislature's grant of authority to cities to regulate and charge fees to both categories but to exclude only public utilities from its territory, reinforces the above implication of the statutory wording.

There is, however, another part of the statutory scheme that we must consider. ORS 221.420(1)(a) incorporates the definition of "public utility" in ORS 757.005. As relevant to this case, ORS 757.005(1)(a)(A) defines a "public utility" as

> "Any corporation, company, individual, association of individuals, or its lessees, trustees or receivers, that owns, operates, manages or controls all or a part of any plant or equipment in this state for the production, transmission, delivery or furnishing of heat, light, water or power, directly or indirectly to or for the public, whether or not such plant or equipment or part thereof is wholly within any town or city."

The trial court held that Emerald is a "public utility" under that definition. However, Emerald relies on the exception in ORS 757.005(1)(b)(A), which provides that the term "public utility" does not include "[a]ny plant owned or operated by a municipality." In turn, ORS 756.010(4) defines "municipality," as used in ORS chapters 756, 757, 758, and 759, to mean "any city, municipal corporation or quasi-municipal corporation."[12] Emerald concludes that it is a

_____

[12] The legislature uses terms as appropriate to the specific context, and it may find it useful to give words different meanings in different contexts. For example, several statutes refer to municipally owned providers of utility services as "public

"municipality" or a "quasi-municipality corporation" so as to be excluded from the definition of a "public utility" in ORS 221.420.

ORS 756.010(4) provides a broad definition of "municipality" that expressly includes entities other than cities. The board argues that by its terms the definition of "municipality" does not apply to ORS chapter 221 (concerning the authority of a city) or ORS chapter 261 (establishing PUDs). Indeed, as it points out, ORS 221.420 defines "municipality" as a town, city, or other municipal government where the property of the utility is located. The purpose of the definition in that statute, however, is to define what entities have the authority to regulate and exclude public utilities under the statute. ORS 221.420(1)(a) does not use the term "municipality" but, rather, expressly adopts the definition of public utility in ORS 757.005. In addition, as the state points out in its *amicus* brief, holding that Emerald is not a municipality under ORS 757.005(1)(b)(A), which would be necessary in order to hold that it is a public utility under ORS 221.420(1)(a), would necessarily mean that Emerald is a public utility subject to the PUC's regulatory authority. That would be contrary to the PUC's consistent position that PUDs, like other publicly owned utilities, are outside of its regulatory authority except when statutes specifically grant the PUC authority over them, such as the authority to allocate their territory. *See* ORS 758.400-758.475.[13] Adopting the board's position, thus, runs the risk of undoing a carefully considered regulatory system that is reflected in both the statutes concerning utility regulation and the practices of those who administer them. We conclude, therefore, that the legislature intended the broader definition of "municipality" in ORS 756.010(4) to apply to the term "public utility" in ORS 221.420(1).

---

utilities." *See, e.g.,* ORS 33.710; ORS 294.311(19); ORS 294.316(7); and ORS 295.356(3). It is obvious that those statutes do not mean that a municipally owned system is a "public utility" under either ORS 757.005 or ORS 221.420; indeed, the statutes that concern utility regulation carefully distinguish between public utilities and municipal utilities. *See, e.g.,* ORS 757.300.

[13] Indeed, the PUC's authority to allocate territory to a PUD may derive from the PUD's character as a municipality. *See* ORS 758.400(2).

As we have emphasized above, a term like "municipality" may mean different things in different contexts. Thus, in a case involving Emerald's attempt to condemn a hydropower facility on the favorable statutory terms that applied to municipalities, the Supreme Court noted that "the terms 'municipality' and 'municipalities' have no fixed meanings and that their meanings depend on the context in which they are used." *Emerald PUD v. PP&L*, 302 Or 256, 265-66, 729 P2d 552 (1986). In that case, the court also pointed out that chapter 279 of Oregon Laws 1931, which provided for the creation of PUDs and is now ORS chapter 261, "is replete with sections that clearly discriminate between municipalities and PUDs." *Id.* at 266. Thus, the court ascribed an intention to the legislature, when it enacted ORS chapter 261 in 1931 as part of a complete package of legislation that included the statute that gave municipalities the opportunity to purchase hydropower facilities on favorable terms, to use the term "municipality" consistently in related statutes. It therefore held that the legislature intended to exclude PUDs from the definitions of the term "municipalities" under Oregon Laws 1931, chapter 279, as well as under Oregon Laws 1931, chapter 67, section 21. *Id.* at 267-69.[14]

On the other hand, the Supreme Court has held in other cases that PUDs are municipal corporations, rather than special districts, for the purpose of the procedural requirements for their formation. According to the court, PUDs are designed to confer general benefits and have broad powers of taxation and condemnation in order to carry out a governmental function—the conservation of the state's water and power resources—of great importance. *In re People's Utility District*, 160 Or 530, 536-40, 86 P2d 460 (1939). It modified that conclusion in a different context in *Wasco County P.U.D. v. Kelly*, 171 Or 691, 137 P2d 295 (1943). In that case, opponents of the formation of the plaintiff PUD argued that, because it was a municipality, it could be created only by a vote of the people of the district.[15] They relied

---

[14] We have also held that a PUD does not have home rule powers, as a city does. *Douglas Electric*, 164 Or App at 263. That does not affect whether a PUD is a municipality in this context.

[15] There had been a vote before the formation of the PUD. A majority of those in the proposed district as a whole had approved the proposed PUD, but a majority

on the home rule provisions of Article XI, section 2, of the Oregon Constitution to support their argument. That provision prohibits the legislature from enacting, amending, or repealing the charter of any municipality, city, or town but instead gives that authority to the voters. They also relied on Article IV, section 1a,[16] which reserves the powers of initiative and referendum to the voters of every municipality or district. In response, the court held that PUDs are "not pure municipal corporations, but are more accurately to be classified as quasi-corporations." *Wasco County P.U.D.*, 171 Or at 698.[17] It emphasized that the constitutional provisions used "municipality" in a broad and comprehensive sense to include a wide variety of governmental agencies. However, because the constitution did not grant municipalities other than cities and towns the right to enact their own charters, there was no constitutional requirement that the formation of such a municipality be dependent on a vote.

In this case, because the legislature provided that the definition of "public utility" in ORS 757.005(1)(b)(A) also applies to ORS 221.420, and because that definition relies on the definition of "municipality" in ORS 756.010(4), we must look for the meaning of the term in the context of the state regulation of public utilities, just as the court in *Emerald PUD* looked for its meaning in the context of a specific statute. The definition in ORS 756.010(4) is broad, expressly including both municipalities that are not cities and quasi-municipalities. In other statutes, the legislature has expressed its belief that the PUC does not have general regulatory authority over PUDs, which suggests that it considers them to be municipalities under that definition. *See, e.g.*, ORS 261.305(12) (giving PUDs authority to set rates; no reference to PUC involvement); ORS 758.505(6) (defining "nonregulated utility" as a PUD, a municipal utility operating

---

in each of two towns opposed it. The applicable statute prohibited including a city or town in a PUD if a majority of its voters opposed doing so. As a result, the appropriate commission removed the two towns from the boundaries of the PUD when it created it. The PUD's boundaries, thus, were different from the proposed boundaries at the time of the vote.

[16] In 1968 the people replaced both section 1 and section 1a of Article IV with a revised Article IV, section 1; *former* section 1a is now section 1(5).

[17] The court subsequently referred to them as "quasi-municipalities." *Wasco County P.U.D.*, 171 Or at 699.

under ORS chapter 225, or an electric cooperative). To construe "municipality" in ORS 757.005 as excluding PUDs, thereby placing them under PUC regulation, would thus be inconsistent with the structure of utility regulation as a statutory scheme.

In sum, the statutory definition of "public utility" is consistent with the distinction that the legislature made in ORS 221.420(2) between public utilities and PUDs. The statute expressly authorizes cities to prescribe the terms and conditions by which all providers of utility services may occupy city streets or other public property, but it authorizes them to exclude only public utilities and heating companies from the use of that property. The legislature has indicated that the allocation of territory among providers of utility services is of great importance.[18] We cannot construe ORS 221.420(2) to extend the authority granted to cities beyond the limits that the legislature clearly intended. The importance that the legislature attached to allocating territories also makes it clear that it intended allocations by the PUC to override a city's home rule authority to make such determinations on its own, except as ORS 221.420(2) expressly permits.[19] We conclude that ORS 221.420 provides the sole authority for a city to exclude a public utility from its streets and other property. Because a PUD is not a public utility for that purpose, that authority does not extend to PUDs. Thus, the board's action purporting to exclude Emerald from territory that the PUC had allocated to it was without effect.

Part of the area in dispute, however, is outside of Emerald's political boundaries and, so far as the record indicates, of its allocated territory. The terms and policy of the allocation statutes do not apply to unallocated territory. So

---

[18] ORS 758.405 provides:

"The elimination and future prevention of duplication of utility facilities is a matter of statewide concern; and in order to promote the efficient and economic use and development and the safety of operation of utility services while providing adequate and reasonable service to all territories and customers affected thereby, it is necessary to regulate in the manner provided in ORS 758.400 to 758.475 all persons and entities providing utility services."

[19] In *PacifiCorp*, we held that a city's authority under ORS 221.420(2) to exclude a public utility overrode the PUC's allocation of territory, although the city in that case had not yet exercised that authority. 89 Or App at 371-72.

far as that territory is concerned, the city's home rule authority is undiminished. The city's charter gave the board the power to exclude other providers of utility service from the city's boundaries, and the board exercised that power. The parties do not point to any statute that limits that exercise of the city's authority, and we are aware of none. Unless the PUC has granted Emerald's application to allocate that territory to it—and the present record is silent concerning the PUC's action on that application—the board's exclusion of Emerald from that territory is valid.

Reversed and remanded with instructions to grant defendant's motion for summary judgment as to territory allocated to defendant by the Public Utility Commission, to grant plaintiff's motion for summary judgment as to any other territory in dispute, and to enter declaratory judgment accordingly.