Argued and submitted September 28, 2012, affirmed April 9, petition for review allowed August 7, 2014 (355 Or 879)

ROGUE VALLEY SEWER SERVICES,
an Oregon municipality,
*Plaintiff-Appellant,*

*v.*

CITY OF PHOENIX,
an Oregon municipality,
*Defendant-Respondent.*

Jackson County Circuit Court
103450E2; A148968

329 P3d 1

Tommy A. Brooks argued the cause for appellant. Clark I. Balfour, Carla Scott, and Cable Huston Benedict Haagensen & Lloyd LLP filed the opening brief. With him on the reply brief were Clark I. Balfour and Carla Scott.

Kurt H. Knudsen argued the cause and filed the brief for respondent.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

ARMSTRONG, P. J.

**ARMSTRONG, P. J.**

At issue in this case is the validity of a City of Phoenix ordinance that imposes on Rogue Valley Sewer Services (RVS) a five percent fee on gross receipts that RVS collects from residents of the city for sewer services. RVS contends that the city is not authorized to charge the fee and seeks to enjoin the city from enforcing the ordinance. The trial court decided the issue on summary judgment and concluded that the city's ordinance was valid. RVS appeals, and we affirm.

The relevant facts are not disputed. RVS is a sanitary authority organized under ORS chapter 450. In 2004, RVS began providing sewer services to city residents pursuant to a contract with the city. *See* ORS 450.830 ("The authority may furnish sewage disposal service to areas outside the authority on a contract basis."). In 2006, the city residents passed a ballot measure that, with RVS's approval, annexed the city into the boundaries of RVS for sewer services.

The city is a home-rule municipality governed by a charter enacted in 2009. Among other things, the charter grants the city the following authority:

> "Section 4. Powers. The city has all powers that the constitutions, statutes, and common law of the United States and of this state now or hereafter expressly or impliedly grant or allow the city, as fully as though this charter specifically enumerated each of those powers.

> "Section 5. Construction of Powers. The charter will be liberally construed so that the city may exercise fully all powers possible under this charter and under United States and Oregon law. All powers are continuing unless a specific grant of powers clearly indicates the contrary."

2009 Phoenix Charter, ch II, §§ 4, 5.

In 2010, the city adopted ordinance 928, as amended by ordinance 931, which "imposes and levies an annual franchise fee in an amount equal to five percent of the annual gross revenue of RVS as defined herein. Such payment shall be in addition to taxes or fees, if any, owed to the city by RVS or that are imposed by law." Phoenix Municipal Code § 13.20.030. The ordinance defines "gross revenue" as "any

revenue * * * received by RVS from the operation of its business within the city limits of the city of Phoenix; provided, however, that such phrase shall not include [certain fees, debts, and other exclusions]." *Id.*

In the preamble to the adoption of ordinance 928, the city stated, among other things, that "it is the intent of the City to cover its full costs and the full impacts to its streets and rights of way in connection with the RVS sewerage system," that "the primary purpose of the collection of a franchise fee from RVS is to regulate and reimburse the City for its costs associated with RVS, and not to raise revenue," that "the intent of the City in enacting this ordinance is to allocate money collected from RVS only for costs and reimbursement connected with proper regulatory purposes," and that "there is a direct relationship between the fee charged and the burden produced by the fee payer, RVS." The preamble also stated that, in imposing the fee on RVS, the city relied on its implied authority to charge a franchise fee on a utility for operation in the city rights-of-way, "even absent an agreement between the City and the utility," and ORS 450.815(7), which gives RVS the authority to use city rights-of-way for utility purposes, subject to complying with conditions of consent imposed by the city.

RVS brought this action seeking a declaration that the city's ordinance is invalid and an injunction prohibiting the city from attempting to collect the five percent franchise fee. RVS and the city both moved for summary judgment. RVS argued that the city's authority to impose a franchise fee on RVS was preempted by Oregon law. Specifically, RVS argued that the imposition of the fee constituted an impermissible regulation of RVS's utility rates because RVS would be required to raise rates to cover the fee and because the ordinance is inconsistent with ORS 221.420, which permits local governments to levy franchise fees against certain utilities, but not a sanitary authority, for use of public rights-of-way. The city argued that it was authorized to impose the fee based on its authority as a home-rule municipality to collect a franchise fee from a utility using the city rights-of-way; ORS 450.815(7), which requires a sanitary authority to comply with a city's conditions of consent to use the city

rights-of-way; and the city's authority to impose conditions on a license to use the city rights-of-way.

The court granted the city's summary judgment motion and denied RVS's motion. In its order, the trial court framed the issue as "whether or not the City of Phoenix, Oregon, under its home rule charter can charge a franchise fee on sewer operations provide by [RVS]." The trial court concluded that "the analysis of the City of Phoenix in its motion and in its response to [RVS]'s motion is correct in that it has the authority to impose the fee."

Following entry of the trial court's order, RVS lodged an objection to the city's proposed judgment. RVS asserted that the trial court's order had not disposed of all the issues in the case because it had not decided whether the amount of the city's franchise fee was reasonable. The trial court rejected RVS's objection, concluding that RVS had not challenged the reasonableness of the fee in its complaint, nor in its motion for summary judgment. The court concluded:

> "To be sure, in arguing the ordinance is too broad, RVS cited the amount of the fee, but any such argument is subsumed within the argument about the propriety of the ordinance (assuming [the city] had the authority to enact it), and the [c]ourt's decision upholding [the city]'s authority to impose the fee, the content of the ordinance, and the imposition of the fee, disposed of RVS' argument about the amount of the fee."

The court then entered a general declaratory judgment for the city as follows: "The City of Phoenix, Oregon has the authority under its home rule charter to impose a franchise fee on sewer operations provided by Rogue Valley Sewer Services. The City may impose the fee specified in its ordinance under this authority."

RVS now appeals the general judgment, arguing that the trial court erred in concluding that the city was authorized to impose the five percent franchise fee, and, alternatively, that the court erred in granting summary judgment because genuine issues of material fact exist regarding the calculation of the fee. We may affirm the trial court's grant of summary judgment if, viewing the summary judgment record and making all reasonable inferences in

favor of RVS, we determine that there is no genuine issue of material fact and that the city is entitled to judgment as a matter of law. *Jones v. General Motors Corp.*, 325 Or 404, 408, 420, 939 P2d 608 (1997).

Turning to RVS's main concern, the validity of the city's franchise-fee ordinance, we begin with a well-settled general proposition articulated by the Supreme Court in *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *adh'd to on recons*, 284 Or 173 (1978): "[T]he validity of local action depends, first, on whether it is authorized by the local charter or by a statute, ***; second, on whether it contravenes state or federal law." *See also AT&T Communications v. City of Eugene*, 177 Or App 379, 389, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002) ("Whether a city has the authority to impose a tax *** depends on two issues: First, whether the charter of the city confers the authority to impose the tax; and second, whether that authority has been preempted by state or federal law.").

Although RVS had contended in the trial court that it "does not dispute" the general proposition that the city charter granted the city the authority to impose the fee at issue here, unless it was preempted by state or federal law, RVS now makes a more nuanced argument to us that that general proposition does not apply in this case. Essentially, RVS contends that, because RVS was formed under ORS chapter 450, and thus is a "local government" and a "public body" as those terms are defined in ORS chapter 174, the city must have a specific and express statutory grant of authority to charge the fee against RVS. In other words, in RVS's view, where a home-rule municipality seeks to impose a fee against another local governmental entity, the general proposition is reversed—instead of the city's fee being presumed to be *valid* under the broad charter authority (except as limited by state or federal law), the city's fee would be presumed to be *invalid*, unless the city can point to a specific and express grant of authority from the legislature to impose the particular fee at issue. We do not agree with RVS's proposition. The mere fact that RVS is organized as a sanitary authority under ORS chapter 450 does not serve to circumscribe the city's authority as a home-rule municipality.

In making its argument, RVS relies on two cases that issued before *LaGrande/Astoria*—*viz.*, *Portland v. Multnomah County*, 135 Or 469, 296 P 48 (1931), and *Cent. Lincoln P.U.D. v. State Tax Com.*, 221 Or 398, 351 P2d 694 (1960). However, those cases do not stand for the broad principle that RVS derives from them.

In *Portland v. Multnomah County*, the court addressed whether the county could collect property taxes owed on city-owned real property, where the taxes were assessed before, but not levied until after, the city had obtained title to the property. The court concluded that the county could not collect the taxes from the city (or impose a lien on the city's property). 135 Or at 473-74. However, the court did not derive that answer from a larger principle regarding one municipal corporation imposing fees, taxes, or regulations upon another municipal corporation; rather, it was derived from a narrow, common-law rule (which was also codified in the state tax code) that public property held for public use is exempt from taxation. The court concluded that the city's property was "clearly exempt from taxation under the statute." *Id.* at 473. Thus, any authority of the county to levy the property tax against city property was preempted by state law.

*Cent. Lincoln P.U.D.* is also inapposite. That case involved the *state's* authority to levy a corporate excise tax against a people's utility district (PUD), a quasi-municipal corporation. The court was called on to decide if the PUD fell within the definition of corporations covered by the statute imposing the tax, and the court concluded that it did. 221 Or at 405-06. In declining to decide a question not before it—whether the state could tax a municipality—the court recited the proposition that, in the absence of a constitutional prohibition, the state can tax the property of a city or county, but cautioned, "The intention to tax a municipality is not to be inferred, but must be clearly manifested by an affirmative legislative declaration." *Id.* at 406. In stating those propositions, the court cited to cases discussing the general statutory exemption from taxation for public property in public use. *See Portland v. Welch et al*, 126 Or 293, 296-97, 269 P 868 (1928) (city real property exempt from

county taxation under statute); *State v. Preston*, 103 Or 631, 636-37, 206 P 304 (1922) (specific statute imposing vehicle license fee that did not exempt the type of city vehicle at issue controlled over general statute exempting municipal property from taxation). The court was not asked to decide whether a city was prohibited from taxing a municipal corporation without express statutory authorization.

Nothing about those two early cases limits the authority of a home-rule city to impose a franchise fee on a municipal corporation using a city's rights-of-way for its operations within the city—which is the circumstance presented by this case.[1] *See Springfield Utility Board v. Emerald PUD*, 191 Or App 536, 542, 84 P3d 167 (2004), *aff'd in part, rev'd in part on other grounds*, 339 Or 631, 125 P3d 740 (2005) (declining to draw broad principle limiting city charter authority to regulate another governmental entity from cases discussing a narrow limitation). The city's home-rule authority is derived from two provisions in the Oregon Constitution, which are now found in Article XI, section 2, and Article IV, section 1(5).[2] "Those 'home rule' provisions permit the people of cities or towns to determine

---

[1] The parties have argued at length about the nature of the fee—whether it is, in RVS's view, a revenue-producing tax or, in the city's view, a reimbursement fee. RVS may be correct that the city's fee contains characteristics of a tax for the privilege of using the public rights-of-way. However, the trial court did not resolve that question, which may present issues of fact on this record, because the court concluded, as a matter of law, that the city could enact and enforce its ordinance under its home-rule authority. On appeal, we are asked to review that legal conclusion. Thus, we also do not confront whether the city's ordinance enacts a reimbursement fee or a tax because the source of the city's authority to impose the fee—whatever its nature—is the same, *viz.*, the city's home-rule charter. The parties' argument would be of consequence only if the question whether the fee was preempted by a state or federal law hinged on the distinction between a revenue-producing tax and a reimbursement fee, which it does not in this case. *See Proctor v. City of Portland*, 245 Or App 378, 391-92, 263 P3d 1099 (2011), *rev den*, 351 Or 649 (2012) (ordinance was preempted by statute because the fee was a "business license tax" under that statute).

[2] The "home rule" provisions in the Oregon Constitution were adopted by initiative in 1906. *See LaGrande/Astoria*, 281 Or at 140-41. Article XI, section 2, provides, in part, "The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon, * * *." Article IV, section 1(5) provides that the initiative and referendum powers set out in Article IV, section 1, "are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district."

for themselves the organization and powers of their local governments without the need to obtain authority from the state legislature." *AT&T,* 177 Or App at 389. Where a city's charter broadly confers all authority not denied by state or federal law—as the city's charter did here—it confers on the city the power to impose local taxes and to regulate matters subject to municipal regulation. *Id.* (taxes); *Ashland Drilling, Inc. v. Jackson County,* 168 Or App 624, 634, 4 P3d 748, *rev den,* 331 Or 429 (2000) (regulations). Thus, the question is not whether the city can identify an express statutory authorization for the franchise fee imposed on RVS for use of the city's rights-of-way—because the city's charter grants it all authority to the limit of municipal power—but whether the city was prohibited from imposing the fee by state or federal law. *See US West Communications v. City of Eugene,* 336 Or 181, 186, 81 P3d 702 (2003) ("The question is not whether ORS 221.515 authorizes the city to impose its two percent registration fee. Rather, the question is whether state or federal law prohibits the city from doing so." (Citations omitted.)); *Jarvill v. City of Eugene,* 289 Or 157, 169, 613 P2d 1, *cert den,* 449 US 1013 (1980) (rejecting argument that city tax was invalid without specific statute authorizing it; "A municipal corporation may assume powers to impose taxes and to select the kinds of taxes most appropriate in order to provide governmental services.").

RVS also asserts that the city's ordinance is preempted by statutes in ORS chapter 450, establishing sanitary authorities, and by ORS 221.420 and ORS 221.450. RVS argues that the city's franchise fee is inconsistent with legislative policy because "the legislature meant its statutory scheme to be exclusive." Because RVS's arguments require us to determine the intention of the legislature in enacting those statues, we look to the text of the statutes in context, along with any legislative history that is useful to our analysis. *State v. Gaines,* 346 Or 160, 171-72, 206 P3d 1042 (2009).

In *LaGrande/Astoria,* the Supreme Court explained that, in determining whether a local law is preempted, "the first inquiry must be whether the local rule in truth is incompatible with the legislative policy, either because

both cannot operate concurrently or because the legislature meant its law to be exclusive." 281 Or at 148. In making that determination, we are required to interpret the local enactment, "if possible, to be intended to function consistently with state laws." *Id.* We have previously explained:

> "A local ordinance is not incompatible with state law simply because it imposes greater requirements than does the state, nor because the ordinance and the state law deal with different aspects of the same subject. Rather, we generally assume that the legislature did not mean to displace local regulation of a local condition unless its intent to do so is apparent."

*Thunderbird Mobile Club v. City of Wilsonville,* 234 Or App 457, 474, 228 P3d 650, *rev den,* 348 Or 524 (2010) (quoting *Springfield Utility Board,* 191 Or App at 541-42). An argument that a statutory scheme "occupies the field" does not change how we determine a state law's preemptive effect:

> "Under *LaGrande/Astoria,* * * * the occupation of a field of regulation by the state has no necessary preemptive effect on the civil or administrative laws of a chartered city. Instead, a local law is preempted only to the extent that it 'cannot operate concurrently' with state law, *i.e.,* the operation of local law makes it impossible to comply with a state statute."

*Id.* at 474. Thus, we will not determine a local ordinance to be preempted by implication—the legislature's preemptive intention must be apparent—that is, "clear and unequivocal"—or the concurrent operation of the local and state law must be impossible.

With regard to ORS chapter 450, RVS argues that it sets out the exclusive authority for RVS to levy taxes and fees related to its operations and to set rates for its customers. RVS asserts that the city's fee is impermissible "de facto rate setting" because the city is imposing a fee without RVS's consent that will require RVS to increase its rates to cover the fee.

The statutes at issue are ORS 450.705 to 450.989, which govern sanitary authorities, such as RVS. Those

statutes were first enacted in 1955. In enacting those statutes, the legislature included a declaration of its purpose:

> "It hereby is recognized and declared that the sewage disposal, drainage, insect control and related problems in many of the areas of the state where the population is rapidly expanding can best be solved through the cooperative and integrated effort and support of unincorporated and incorporated areas. It is the purpose of ORS 450.600 to 450.989 to provide a means whereby such cooperation and integration can be achieved and ORS 450.600 to 450.989 is to be construed liberally to accomplish this purpose."

ORS 450.705(1); *see also* Or Laws 1955, ch 614, § 1. Consistently with that declared intent, the statutes set forth the purposes of a sanitary authority, how an authority is to be formed and governed, and the specific powers granted to an authority.

RVS points in particular to statutory provisions that authorize RVS to recoup expenses and construction, operation, and maintenance costs from the benefited areas of its customer base through sewer charges, special assessments, and property taxes, as conveying the legislature's intent to "occupy the field," such that the city cannot levy its franchise fee against RVS.[3] By pointing to those sections, RVS emphasizes that it, not the city, is to set the service charges and assessments for its customers. RVS then argues that the city's fee is inconsistent with those statutes and the authority reserved to RVS because it amounts to "de facto rate setting." We reject that proposition. Nothing about the city's fee seeks to set rates for RVS's customers. The record demonstrates that the city's intended purpose in imposing the fee on RVS is to "cover its full costs and the full impacts

---

[3] RVS cites to ORS 450.840(2) (cost of operation and maintenance of sewer system to be borne by benefited area); ORS 450.855(3) (for new construction areas, the authority may determine the manner the benefited area is to bear the cost of construction); ORS 450.870 (setting out procedure for authority to specially assess property for new construction); ORS 450.880 (authorizing authority to adopt ordinances imposing sewer service charges to finance construction, operation, and maintenance); ORS 450.885(1)(a) (authorizing authority to levy a tax on property within the authority to pay for expenses and general obligation bonds); ORS 450.885(4) (requiring authority to prepare a budget and fix the amount to be raised by taxation); and ORS 450.815(9) (authorizing authority to "[f]ix sewer charges and rentals").

to its streets and rights of way in connection with the RVS sewerage system" and "to regulate and reimburse the City for its costs associated with RVS."

What the statutes demonstrate is the legislature's intention to constrain the powers of sanitary authorities to those conferred in the act. What is wholly lacking from that statutory scheme is any apparent legislative intention to restrict or limit a city's power to regulate a sanitary authority's use of public rights-of-way. *US West,* 336 Or at 187-88 (reading statutory limits on city's taxing and fee-setting authority narrowly as constrained to the precise words used); *AT&T,* 177 Or App at 395 ("[I]t is generally required that the legislature's preemptive intentions be clearly stated."). Indeed, ORS 450.815(7), which is discussed in more detail below, recognizes the authority of a city to regulate its rights-of-way and requires a sanitary authority to obtain a city's consent, and comply with any conditions of that consent, before occupying a city's rights-of-way. As set out above, the legislature's declared purpose was to create a means for unincorporated and incorporated areas to cooperate and provide integrated sewer services to areas with expanding populations. The city's ordinance imposing a franchise fee on a sanitary authority for use of the city's rights-of-way is not incompatible with that declared legislative policy. *See LaGrande/Astoria,* 281 Or at 148. Under the standards that we are required to apply, the city's ordinance is not preempted by ORS 450.705 to 450.989 because it can operate concurrently with those statutes.

Returning to ORS 450.815, which sets forth the general powers of a sanitary authority, the parties disagree as to the effect of ORS 450.815(7). That statute provides:

"For the purpose of carrying out the powers granted to the authority under other provisions of ORS 450.600 to 450.989 and in addition thereto, the authority may:

"* * * * *

"(7) Lay its sewers and drains in any public street, highway or road in the county, and for this purpose enter upon it and make all necessary and proper excavations,

restoring it to its proper condition. However, the consent of the proper city, county or state authorities, as the case may be, shall first be obtained and the conditions of such consent complied with."

That subsection gives a sanitary authority the power to lay its sewers and drains in public streets, but requires it to "first" obtain the consent of the city and comply with "the conditions of such consent." That subsection has not been amended since its enactment in 1955.

RVS asserts that the city cannot rely on ORS 450.815(7) for authority to impose its franchise fee on RVS because the statute does not expressly permit such fees and only requires RVS to abide by conditions of consent imposed by the city before using the city rights-of-way; that is, RVS reasons, the statute does not allow the city to add new conditions of consent once consent has been given. The city responds that nothing in the statute limits the types of conditions that a city may impose on a sanitary authority.

As we have explained above, 262 Or App at 190-91, the city is not required to find express statutory authority for its ordinance; rather, we must determine whether any statute prohibits the city's ordinance. ORS 450.815(7) does not express a legislative intention to prohibit the city's fee. The statute recognizes that cities, counties, and state authorities have the power to regulate use of their public rights-of-way and sanitary authorities must comply with the conditions of their consent for use of those rights-of-way. The city's ordinance, which imposes a fee on RVS for its use of the city's rights-of-way, can operate concurrently with ORS 450.815(7). Although the statute does suggest that "conditions of consent" are ones imposed before the sanitary authority lays its sewers and drains, nothing in that statute is inconsistent with a city subsequently charging fees to address the effects of the sanitary authority's continued use of the rights-of-way after the initial consent is given. ORS 450.815(7) only prohibits a sanitary authority from laying its sewers and drains until after it obtains the appropriate governmental consent. We emphasize that the statute sets out the limits of a *sanitary authority's powers*, not those of a city.

We next turn to ORS 221.420[4] and ORS 221.450.[5] RVS argues that those two statutes occupy the entire field of how franchise fees may be charged against any utility—either the city must enter into a negotiated franchise agreement or the city may impose a privilege tax by ordinance only as provided in those statutes. RVS argues that, because those statutes provide the only means for imposing franchise fees, and because sanitary authorities are not included in the list of utilities in those statutes, the city is without authority to impose its fee on RVS. RVS reads significance into the absence of sanitary authorities from the list of utilities because other specific utilities have been included by subsequent amendments to those statutes. The city again points out that nothing in those statutes shows a "manifest preemptive intent" of the legislature, nor do the statutes nullify the requirement in ORS 450.815(7) that a sanitary authority comply with the conditions of consent a city imposes for use of its rights-of-way.

Prior cases addressing arguments similar to RVS's are instructive. In *US West*, the Supreme Court addressed whether a city could impose a two percent registration fee on telecommunications carriers. US West argued that the city could not impose the fee, in addition to a seven-percent

---

[4] ORS 221.420 provides, in part,

"(2) Subject to ORS 758.025, a city may:

"(a) Determine by contract or prescribe by ordinance or otherwise, the terms and conditions, including payment of charges and fees, upon which any public utility, electric cooperative, people's utility district or heating company, or Oregon Community Power, may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility or heating company therefrom."

[5] ORS 221.450 provides, in part,

"Except as provided in ORS 221.655, the city council or other governing body of every incorporated city may levy and collect a privilege tax from Oregon Community Power and from every electric cooperative, people's utility district, privately owned public utility, telecommunications carrier as defined in ORS 133.721 or heating company. The privilege tax may be collected *only if the entity is operating for* a period of 30 days within the city without a franchise from the city and actually using the streets, alleys or highways, or all of them, in such city for other than travel on such streets or highways. The privilege tax shall be for the use of those public streets, alleys or highways, or all of them, in such city in an amount not exceeding five percent of the gross revenues of the cooperative, utility, district or company currently earned within the boundary of the city. * * *."

privilege tax already imposed for use of public rights-of-way, because ORS 221.515 limited privilege taxes to seven percent. The court rejected US West's argument. First, the court emphasized, "The question is not whether ORS 221.515 authorizes the city to impose its two-percent registration fee. Rather the question is whether state or federal law prohibits the city from doing so." 336 Or at 186 (citations omitted). Looking at the plain terms of ORS 221.515, the court concluded that the statute imposes a limit of seven percent only on taxes for the privilege of using public rights-of-way; that subsection "does not prohibit a city from recovering an additional tax or fee for any other activity that a telecommunications carrier might undertake within a city." *Id.* at 187. Because the specific limitations in the statute were narrower than argued by US West, the court upheld the city's ordinance imposing the two-percent registration fee.

In *AT&T*, the City of Eugene enacted an ordinance imposing a registration fee and a licensing fee of seven percent for use of the city's rights-of-way. 177 Or App at 383. AT&T argued that ORS 221.515 preempted the ordinance because it only authorized the city to tax "telecommunication carriers"—a definition that did not cover AT&T. *Id.* at 387. We rejected that reasoning. Although we agreed that AT&T was not a telecommunications carrier under ORS 221.515, we noted that "[a]bsent from that statute is any language remotely suggesting that a municipality cannot levy any other tax." *Id.* at 388, 390. Because ORS 221.515 did not expressly *prohibit* the city's fees, it did not preempt them.

The reasoning in *US West* and *AT&T* applies equally here to the city's ordinance imposing a five percent franchise fee on RVS. ORS 221.420 provides that

"a city may *** [d]etermine by contract or prescribe by ordinance or otherwise, the terms and conditions, including payment of charges and fees, upon which any public utility, electric cooperative, people's utility district or heating company, or Oregon Community Power, may be permitted to occupy the streets, highways or other public property within such city[.]"

Similarly, ORS 221.450 provides that, for use of the public rights-of-way, "the city council * * * may levy and collect a privilege tax from Oregon Community Power and from every electric cooperative, people's utility district, privately owned public utility, telecommunications carrier as defined in ORS 133.721 or heating company." The city does not dispute that RVS does not fit within the definition of "public utility," which is incorporated from ORS 757.005, for those statutes.[6] ORS 221.420(1)(a). Thus, the situation presented here mirrors that discussed in *AT&T*—although ORS 221.420 and ORS 221.450 discuss the taxes and fees that may be imposed on other utilities for use of public rights-of-way, absent from those statutes is any language remotely suggesting that the city cannot levy fees for use of its rights-of-way on utilities *not* covered by the statutes.

In an effort to avoid the straightforward application of the principles expressed in *US West* and *AT&T*, RVS argues that only utilities listed in ORS 221.420 and ORS 221.450 were intended by the legislature to have to pay such fees or taxes for use of public rights-of-way. RVS asserts that that intention is manifest by the legislature's amendment of the statutes to add certain publicly owned utilities—*viz.*, electric cooperatives and people's utility districts (PUDs)—but not sanitary authorities.

The legislature amended ORS 221.420 and ORS 221.450 to include references to cooperatives and PUDs in 1987 in response to a circuit court decision that had concluded that a city could not impose such fees by ordinance on PUDs. Or Laws 1987, ch 245; Staff Measure Summary, HB 3021-A, Senate Committee on Agriculture and Natural Resources (May 15, 1987). However, the text of the 1987 amendments do not express any legislative intention to

---

[6] Under ORS 757.005(1)(b), the definition of "public utility" excludes "[a]ny plant owned or operated by a municipality." RVS, as a sanitary authority, qualifies as a "municipality" for purposes of the definition of "public utility" in ORS chapter 757. *See* ORS 756.010(4) ("As used in ORS chapters 756, 757, 758 and 759 * * * '[m]unicipality' means any city, municipal corporation or quasi-municipal corporation."); ORS 198.605 ("Local service districts, as defined by ORS 174.116, are municipal corporations."); ORS 174.116(2)(r) ("Subject to ORS 174.108, as used in the statutes of this state 'local service district' means * * * [a] sanitary authority, water authority or joint water and sanitary authority organized under ORS 450.600 to 450.989.").

preempt the imposition of fees on a sanitary authority or any other nonlisted utility. *See Springfield Utility Board,* 191 Or App at 544-47 (detailing legislative history of ORS 221.420). Further, the legislative history of the 1987 amendments confirms that the legislature's intention in enacting those changes was to settle legislatively the ongoing court dispute between cities and a PUD over the authority of cities to impose franchise fees on PUDs, and to confirm that past practices by the cities were authorized. *See, e.g.,* Minutes, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, 3-6; Minutes, House Committee on Environment and Energy, HB 3021, Apr 29, 1987, 7-8; Minutes, Senate Committee on Agriculture and Natural Resources, HB 3021, May 15, 1987, 2. Nothing in the legislative history indicates that the legislature intended, by those amendments, to preempt city authority to impose fees on other types of utilities, nor that the legislature believed that the existing law operated in that manner. ORS 221.415, which was enacted as part of the same bill that amended ORS 221.420 and ORS 221.450, confirms that intent by recognizing and reaffirming the independent authority of cities to regulate the use of their public rights-of-way.[7] *See also AT&T,* 177 Or App at 398 (so noting). ORS 221.420 and ORS 221.450 do not suggest that the legislature intended to preempt a city's ability to charge fees for a sanitary authority's use of the city's rights-of-way, and it is not impossible for the city's ordinance and those statutes to operate concurrently. Accordingly, because RVS has not identified any state law that preempts the city's ordinance here, we conclude that the trial court did not err in concluding that the city had the authority to enact and enforce its ordinance against RVS.

Having concluded that the city is authorized to impose the franchise fee on RVS, we next address RVS's contention that the trial court erred when it also granted

---

[7] ORS 221.415 provides:

"Recognizing the independent basis of legislative authority granted to cities in this state by municipal charters, the Legislative Assembly intends by ORS 221.415, 221.420, 221.450 and 261.305 to reaffirm the authority of cities to regulate use of municipally owned rights of way and to impose charges upon publicly owned suppliers of electrical energy, as well as privately owned suppliers for the use of such rights of way."

summary judgment as to the calculation of the city's fee. RVS argues that it established through affidavits on summary judgment genuine issues of material fact about whether the fee is "reasonably related to the purpose stated in the [o]rdinance to reimburse [the city] for the costs it allegedly incurs as a result of [RVS]'s operations in the [c]ity." The city asserts that RVS failed to preserve its assignment of error because, as determined by the trial court, on summary judgment RVS did not seek a declaration as to the reasonableness of the amount of the fee. We conclude that RVS cannot pursue its assignment of error on appeal for the reasons discussed below.

Following the trial court's grant of the city's motion for summary judgment, RVS lodged an objection to the entry of the city's proposed general judgment, claiming that the court had not decided whether the city's fee was reasonable in amount, and that a genuine issue of material fact existed on that point as raised by the affidavits filed with the parties' respective summary judgment motions. In overruling RVS's objection, the trial court concluded that, prior to the city obtaining a judgment in its favor, RVS had not asked the trial court for a declaration as to the reasonableness of the amount of the city's fee (in the event the ordinance was declared valid). Although the trial court recognized that the parties had discussed the amount of the fee in connection with RVS's arguments that the ordinance was not a valid exercise of the city's power, the court determined that that argument, given its proper context, had been disposed of by the court's determination that the ordinance was valid. In other words, the trial court did not determine that there was no genuine issue of fact as to whether the amount of the city's fee was "reasonable"; instead, the trial court concluded that a separate claim about the reasonableness of the amount of the fee, in an otherwise valid ordinance, had not been put at issue by either RVS's complaint or its motion. RVS did not assign error to the trial court's denial of RVS's objection, and, even if RVS had, the trial court's conclusion was correct: RVS had sought in its complaint a declaration only as to whether the ordinance was valid and whether RVS was "required to collect and pay over the fee described in said ordinance." In its summary judgment motion, RVS did not

challenge the reasonableness of the amount of the fee, but, rather, argued that *the city was not authorized to charge the fee at all* based on the city's stated purpose that it was for reimbursement because, RVS asserted, the amount of the fee was not rationally related to actual costs incurred by the city.

RVS replies that, because the city had included an argument about the reasonableness of the amount of the fee in its motion for summary judgment, to which RVS had responded, the parties had tried the claim by consent. RVS further replies that we, therefore, should deem the complaint to have been amended to include the claim, citing *Fraker v. Benton County Sheriff's Office*, 214 Or App 473, 479-80, 166 P3d 1137, *adh'd to on recons*, 217 Or App 159 (2007). Although RVS correctly states the law on that point, the record does not support RVS's conclusion that the claim was tried by consent.

In its motion, the city raised the amount of the fee in the same context that RVS had in its motion—that is, to contest RVS's claim that the fee was not in fact intended to reimburse the city for RVS's effect on the streets and, thus, not rationally related to the city's stated purpose. As a result, although both parties discussed the amount of the fee in an effort to characterize it, either as reimbursement for RVS's effect on the public streets, or as a tax to generate revenue, neither party in its respective motions (nor in its respective claims or defenses) sought a declaration from the trial court on whether the amount of the fee was reasonable, should the court declare the ordinance to be a valid exercise of the city's authority. Based on that record, we cannot conclude that the parties tried the claim by consent, particularly where, as here, the trial court had not understood the parties to have asserted the claim on summary judgment. Accordingly, the trial court properly declined to issue a declaration on whether the amount of the fee was reasonable because it was without authority to grant declaratory relief that it was not asked to grant. *See Heintz v. Sinner et ux*, 232 Or 529, 533, 376 P2d 478 (1962) ("In law and equity the court cannot award relief outside the issues of the case. The same considerations lead to a similar rule in declaratory

judgment proceedings." (Citations omitted.)). RVS has not challenged on appeal the trial court's reasoning or order declining to issue a declaration on the reasonableness of the amount of the city's fee.

Therefore, we conclude that the trial court did not err in entering a general judgment for the city declaring the city's ordinance to be a valid exercise of the city's authority, which disposed of all issues raised by RVS's complaint.

Affirmed.